FILED

JUN 1 1 2012

Clerk, U.S. District Court
By_____
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,                    )
                                             )
    Plaintiff,                               )
                                             )
    vs.                                      )   Case No. 12-MJ-8126-01/25-JPO
                                             )
LOS ROVELL DAHDA,                            )
    a/k/a ERICK CARLOS WALLACE,              )
    a/k/a LIULE (L),                         )
ROOSEVELT RICO DAHDA,                        )
    a/ka DERICK RICO WALLACE,                )
SADIE JOLYNN BROWN,                          )
JUSTIN CHERIF PICKEL,                        )
    a/k/a FRENCHIE,                          )
DAVID JAMES ESSMAN,                          )
    a/k/a TINY,                              )
AMOS MOSES HURST,                            )
    a/k/a MOSES,                             )
    a/k/a CLOWN,                             )
PHILLIP VILLEREAL ALARCON,                   )
JEFFERY DAVID PAIVA,                         )
MARK LEE ROMERO,                             )
SAMUEL VILLEAREAL, III,                      )
PETER PARK,                                  )
    a/k/a SPIDERMAN,                         )
WAYNE SUHAN SWIFT,                           )
CHARLES THOMAS KREISLER,                     )
    a/k/a TOMMY,                             )
JAMES MICHAEL SODERLING,                     )
SIMON ANDREW TYSON,                          )
TRENT JORDAN PERCIVAL,                       )
CHAD WILLIAM POLLARD,                        )
JASON MARCUS HANSEN,                         )
DANIEL MARK SIEBER,                          )
JUSTIN JEROME MERCER,                        )
JACOB PAUL FORBES,                           )
CHAD EUGENE BAUMAN,                          )
CAREY LYNN WILLMING,                         )
MICHAEL SHANE WITT,                          )
    and,                                     )
STEPHEN MALLSION RECTOR,                     )

1

|  |  |
|---|---|
| **Defendants.** | ) |
|  | ) |
|  | ) |

## SEALED CRIMINAL COMPLAINT

I, Mike McAtee, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### COUNT 1

Beginning in or about April 2008, the exact date being unknown and continuing to on or about June 20, 2012, both dates being approximately and inclusive, in the District of Kansas and elsewhere, the defendants,

**LOS ROVELL DAHDA, a/k/a ERICK CARLOS WALLACE, a/k/a LIULE (L),
ROOSEVELT RICO DAHDA, a/ka DERICK RICO WALLACE;
SADIE JOLYNN BROWN,
JUSTIN CHERIF PICKEL, a/k/a FRENCHIE,
DAVID JAMES ESSMAN, a/k/a TINY,
AMOS MOSES HURST, a/k/a MOSES, a/k/a CLOWN,
PHILLIP VILLEREAL ALARCON,
JEFFERY DAVID PAIVA,
MARK LEE ROMERO,
SAMUEL VILLEAREAL, III,
PETER PARK, a/k/a SPIDERMAN,
WAYNE SUHAN SWIFT,
CHARLES THOMAS KREISLER, a/k/a TOMMY,
JAMES MICHAEL SODERLING,
SIMON ANDREW TYSON,
TRENT JORDAN PERCIVAL,
CHAD WILLIAM POLLARD,
JASON MARCUS HANSEN,
DANIEL MARK SIEBER,
JUSTIN JEROME MERCER,
JACOB PAUL FORBES,
CHAD EUGENE BAUMAN,
CAREY LYNN WILLMING,
MICHAEL SHANE WITT,**

2

**and**
**STEPHEN MALLSION RECTOR,**

knowingly and intentionally conspired and agreed together and with each other, and with other persons known and unknown, to commit the following offenses against the United States:  to distribute and possess with intent to distribute 1,000 kilograms or more of marijuana, a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(vii), and Title 18, United States Code, Section 2.

This was all in violation of Title 21 United States Code, Section 846.

The following facts were made known to me by personal observation or from information I received from DEA Agents, DEA Task Force Officers, other law enforcement officers, and/or from other individuals:

1.  I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.  I have been a sworn police officer and detective with the Lawrence, Kansas Police Department (LKPD) for over 19 years.  I have been assigned to the Lawrence/Douglas County, Kansas Drug Enforcement Unit (DEU) and a deputized Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) assigned to the Kansas City District Office for the purpose of assisting in the present investigation.  I have testified as an expert witness in both federal and state courts concerning violations of the Uniformed Controlled Substance Act and about aspects of criminal street gangs and their members.  While with LKPD, I have participated in

3

numerous drug investigations, to include conspiracies associated with criminal drug trafficking offenses involving possession with intent to distribute, distribution and manufacture of controlled substances, including cocaine, marijuana, heroin and methamphetamine, as well as, investigating activity directed at monetary transactions involving the proceeds of specified unlawful activities, in violation of Title 21, U.S.C. §841(a)(1) - Transportation and Distribution of Controlled Substances, §843(b) - Unlawful use of a Communication Device to Commit and Facilitate the commission of Drug Trafficking Offenses, §846 - Conspiracy and Attempt to Possess with Intent to Distribute and Distribution of Controlled Substances, §952 and §960 - Importation of Controlled Substances, and §963 - Conspiracy and Attempt to Import Controlled Substances.  I have had specialized training (over 500 hours) concerning drug trafficking investigations, including conducting physical surveillance, execution of search warrants, and the handling of cooperating individuals and sources of information.  On numerous occasions, I have spoken with suspects, defendants and narcotics investigators concerning the methods and practices of drug traffickers. Through these investigations and/or training, I have become familiar with the methods employed by drug traffickers in general, including large domestic and Mexico based drug trafficking organizations, to smuggle, safeguard, distribute drugs, and to collect and launder drug-related proceeds.  These methods include the use of various communication devices, counter-surveillance, elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious identities, and coded communications in an attempt to avoid detection by law enforcement and to circumvent drug investigations.

3. In August 2008, William GARCIA, was arrested regarding a domestic violence investigation and as part of the investigation officers located and seized a handgun. The domestic violence investigation revealed William GARCIA possessed the handgun. William GARCIA agreed to be interviewed by myself and Officer Ramsey. William GARCIA advised he obtained the firearm and ammunition to protect his family. William GARCIA agreed to assist law enforcement with regards to other criminal activity in the hopes of receiving consideration on his pending cases. William GARCIA reported from April 2008 through August 2008, he obtained multiple pounds of marijuana and multiple ounces of powder cocaine, approximately five times during the four month time frame. William GARCIA explained the last time he obtained illegal narcotics was approximately two weeks before he was arrested. William GARCIA reported he obtained ten pounds of marijuana and nine ounces of powder cocaine from Los DAHDA during the last drug transaction and indicated this was the most he had received from Los DAHDA and/or Los DAHDA's younger brother, Nathan Wallace. William GARCIA explained during the four month time period he would call Los DAHDA's cellular telephone and order the marijuana and cocaine. Los DAHDA and/or Nathan Wallace would later deliver the illegal narcotics. William GARCIA reported he would then sell the marijuana and cocaine to other people. William GARCIA said that Los DAHDA's sources of supply were Mexican nationals who lived in the Kansas City metropolitan area. William GARCIA reported he has known and has been friends and criminal street gang associates with Los DAHDA and Nathan Wallace for several years and that they trusted him. William GARCIA later spoke to me and stated he would not assist law enforcement

5

further because of the relationship between himself and Los DAHDA. William GARCIA explained he would rather go to federal prison than assist law enforcement in the investigation of Los DAHDA and/or Nathan Wallace. William GARCIA eventually plead guilty in the District of Kansas and was sentenced to twenty seven months imprisonment on August 17, 2009.

4. In October 2011, DEU Officer Casey Cooper and I interviewed a Cooperating Individual (hereinafter referred to as CI-1), who agreed to cooperate with law enforcement in the hopes of receiving some consideration regarding a pending felony case. CI-1 reported Chad BAUMAN had been CI-1's source of supply in 2008. CI-1 received one to two pounds of high grade marijuana each month, for approximately six months from Chad BAUMAN and paid Chad BAUMAN $4,000.00 per pound for the high grade marijuana, which CI-1 would later distribute to his/her customers in the State of Kansas. CI-1 explained Chad BAUMAN was very secretive and would not divulge his source of supply, his other customers and/or the amounts of high grade marijuana he distributed to others. CI-1 explained CI-1 would go to Chad BAUMAN's business, Extreme Carpet Cleaning and Restoration, 1460 N 1823 Road Suite #A, Lawrence, Kansas, and/or to Chad BAUMAN's residence in Lawrence, Kansas, where CI-1 obtained the high grade marijuana. CI-1 had seen several cardboard boxes, which had initials written on the outside. CI-1 would receive the high grade marijuana, which was packaged in a cardboard box, with CI-1's initials. The high grade marijuana was sealed in two vacuum sealed bags and would have the strain of high grade marijuana handwritten on the outside of the bag. CI-1 stated on at least one occasion when CI-1 picked up high grade

6

marijuana from Chad BAUMAN, CI-1 observed a large crate, which was made of wood. The crate was nailed shut. CI-1 reported their business relationship ended when CI-1 and Chad BAUMAN had a dispute over stolen high grade marijuana and U.S. currency. CI-1 denied any involvement. CI-1 knew Chad BAUMAN and Los DAHDA had a criminal association because after the dispute Chad BAUMAN sent Los DAHDA to confront one of the suspected perpetrators. CI-1 had prior conversations with Los DAHDA who had implied Chad BAUMAN was the source of supply for high grade marijuana for he and his twin brother, Roosevelt DAHDA.

5. In 2011, the DEU joined with DEA and the Internal Revenue Service and began an extensive drug and financial investigation into BAUMAN, the DAHDAs and individuals who were determined to be associated with them. This included a T-III wire investigation which included the following:

   a. On January 4, 2012, orders to intercept wire communications to and from cellular telephone (816) 769-5186 (hereinafter TARGET TELEPHONE #1), and cellular telephone (510) 229-6550/117*305*9155 (hereinafter TARGET TELEPHONE #2), both of whom were utilized by Los DAHDA, were signed by the Honorable Carlos Murguia, District of Kansas. Los DAHDA discontinued the use of TARGET TELEPHONE #2, thus no interceptions occurred.

   b. On January 19, 2012, orders to intercept wire and electronic communications to and from TARGET TELEPHONE #1; wire communications to and from cellular telephone (785) 218-9172 (hereinafter TARGET TELEPHONE #3), utilized by Sadie BROWN; and, wire communication to and from cellular telephone (501) 286-6043/103*163*233 (hereinafter TARGET TELEPHONE #4), utilized by Los

DAHDA; were signed by the Honorable Carlos Murguia, District of Kansas.

c.  On February 17, 2012, orders to continue to intercept wire and electronic communications to and from TARGET TELEPHONE #1 and wire communications to and from TARGET TELEPHONE #4 were signed, along with orders to intercept wire communications to and from cellular telephone (816) 872-6818 (hereinafter TARGET TELEPHONE #5), which was utilized by Roosevelt DAHDA.

d.  On March 12, 2012, orders to intercept wire communications to and from (816) 6180/140*465*2550 (hereinafter TARGET TELEPHONE #6), which was utilized by Roosevelt DAHDA and Sadie BROWN, were signed by the Honorable Carlos Murguia.

e.  On March 20, 2012, orders to intercept wire and electronic communications to and from cellular telephone (415) 786-0290 (hereinafter referred to as TARGET TELEPHONE #7), which was utilized by Phillip ALARCON, were signed by the Honorable Carlos Murguia;

f.  On March 23, 2012, orders to continue to intercept wire communications to and from TARGET TELEPHONE #1 and to commence interception of wire communications to and from cellular telephone (816) 872-6818 (hereinafter TARGET TELEPHONE #5), which was utilized by Roosevelt DAHDA, were signed.

g.  On April 5, 2012, orders to intercept wire communications to and from cellular telephone (816) 277-1398/140*465*2008 (hereinafter TARGET TELEPHONE #8), which was utilized by Roosevelt DAHDA; wire communications to and from

8

cellular telephone (913) 238-7525 (hereinafter TARGET TELEPHONE #9), which was utilized by Peter PARK; and, wire communications to and from cellular telephone (816) 291-7793/140*465*1449 (hereinafter TARGET TELEPHONE #10), utilized by Peter PARK; were signed by the Honorable Carlos Murguia, District of Kansas.

h. On April 25, 2012, orders to intercept wire communications to and from cellular telephone (510) 690-3093/117*306*686 (hereinafter TARGET TELEPHONE #11), which was utilized by Phillip ALARCON, were signed by the Honorable Carlos Murguia, District of Kansas.

i. On May 4, 2012, orders to intercept wire communications to and from cellular telephone (913) 238-7525 (hereinafter TARGET TELEPHONE #9)[1], which was utilized by Peter PARK; and, wire communications to and from cellular telephone (816) 291-7793/140*465*1449 (hereinafter TARGET TELEPHONE #10), utilized by Peter PARK; were signed by the Honorable Carlos Murguia, District of Kansas.

6. On January 19, 2012, at 6:53 p.m., Justin PICKEL utilized cellular telephone (785) 691-6666 to call TARGET TELEPHONE #1 (session #635) and spoke to Los DAHDA. PICKEL stated, "Shit, shit, uh, fucking did you get that uh. First of all I sent you the email, second of all hit me if you get a chance." Based upon knowledge of this investigation, I have learned that "hit me" is coded/guarded

---

[1] During calls between Peter Park and Wayne Swift, they would switch to a foreign language. The foreign language was later determined to be Korean. A certified Korean interpreter/translator was contracted and used to interpret/translate the Korean language spoken between Peter Park and Wayne Swift.

language used to direct a person to call them back on a prepaid cellular telephone.[2]

A. On January 19, 2012, at 6:56 p.m., Los DAHDA utilized TARGET TELEPHONE #4 to contact PICKEL on his prepaid direct connect/push-to-talk cellular telephone (140*465*737) (session #3 and #4).[3] PICKEL advised Los DAHDA in coded language that David ESSMAN was about to contact Los DAHDA. PICKEL then advised Los DAHDA, "Do you want me to have him give you everything including the extra scratch or how do you want to do that?" Los DAHDA stated, "No, I think, just have him send it to you or put it up for you for you, whatever he does." PICKEL advised, "Appreciate man, appreciate it. Alright I'll send him through." Based upon my knowledge, I know "scratch" is a slang term used to describe U.S. currency.

B. On January 19, 2012, at 8:41 p.m., ESSMAN utilized cellular telephone (785) 424-2560 to call TARGET TELEPHONE #1 (session #637) and spoke to Los DAHDA. ESSMAN advised he and Abe Last Name Unknown (LNU) planned to stop by Los DAHDA's residence to pick up a DVR recorder and surveillance camera. Los DAHDA then asked ESSMAN, "Weren't you suppose to come see me anyway?" David ESSMAN replied, "Well, I was waiting. Are you talking

---

[2] Based upon training, experience and knowledge of this investigation, I believe the defendants used prepaid cellular telephones, with the direct connect/push-to-talk feature, because they thought the cellular telephone could not be intercepted and/or because the prepaid cellular telephones do not require accurate subscriber information, which conceals their identifies from law enforcement.

[3] The direct connect/push to talk feature may indicate multiple sessions, which occurred during this intercepted conversation and many of the intercepted conversation to follow, even though it was continuous conversation.

about what I went and did today?" Los DAHDA stated, "Yeah." ESSMAN stated, "Okay, well, I'll grab up Abe and we'll come over there in a few minutes." Later in the conversation Los DAHDA asked ESSMAN, "Alright, peace. You got a key right?" ESSMAN stated, "Yeah."

C. On January 19, 2012, at 8:55 p.m. TARGET TELEPHONE #1 received an incoming call from ESSMAN (session #630). ESSMAN told Los DAHDA, "I left, I got that part box, box of parts for you. I left it on the counter in the kitchen."

D. Based upon training, experience and knowledge of this investigation, I believe PICKEL informed Los DAHDA that PICKEL would direct ESSMAN to deliver U.S. currency, which was obtained through the distribution of high grade marijuana, to Los DAHDA. ESSMAN and Los DAHDA confirmed that ESSMAN planned to come to Los DAHDA's residence and confirmed ESSMAN had a key to the residence. ESSMAN delivered the U.S. currency and confirmed the delivery when he used coded/language to describe the U.S currency as "box of parts" to tell Los DAHDA that the U.S. currency was placed on the counter of Los DAHDA's residence, 119 Pawnee Avenue Lawrence, Kansas.

7. On January 28, 2012, at 3:08 p.m. Amos HURST utilized his cellular telephone (816) 520-9047 to call TARGET TELEPHONE #1 (session #1016) and spoke to Los DAHDA about plans to travel to California. Los DAHDA asked HURST, "I thought you were leaving tomorrow? I thought you were rolling out with him tomorrow?" HURST said, "I thought we were going today, then I talked to him and he was like I don't know. That's the thing, that's the plan." Los DAHDA later told HURST, "Yeah, no. He is for sure, he is leaving for sure tomorrow."

11

A. On January 29, 2012, at 4:01 p.m., Los DAHDA utilized TARGET TELEPHONE #1 to call HURST who utilized cellular telephone (816) 520-9047 (session #1078), Los DAHDA asked HURST, "Got your stuff packed, ready for me to pick you up?" HURST replied "Yeah." Los DAHDA stated, "Alright, I'm coming to get you." DEU Officer Casey Cooper and I conducted surveillance of Los Rovel DAHDA and Wallace who traveled in Los Rovel DAHDA's black dually truck, to a residence in Lawrence, Kansas. HURST exited the residence, 3034 Trail Road, Lawrence, Kansas,[4] and entered the vehicle.

B. Roosevelt DAHDA and HURST, at the direction of Los DAHDA, had planned to leave Lawrence, Kansas and drive to California in Los DAHDA's black dually truck, which had a false compartment concealed in the vehicle's auxiliary fuel tank/tool box. Los DAHDA planned to fly out to California later in the week of January 30, 2012. Investigators believed Roosevelt DAHDA and HURST planned to transport U.S currency to California, in the false compartment, which would be used to purchase high grade marijuana. Additionally, investigators learned that Roosevelt DAHDA had left his direct connect/push-to-talk cellular telephone in Lawrence, Kansas, when he and HURST left Lawrence, Kansas.

C. On January 29, 2012, Roosevelt DAHDA utilized HURST's direct connect/push-to-talk cellular telephone (832) 347-1640/143*576*5542, on several occasions to speak with Los DAHDA who utilized TARGET TELEPHONE #4. Roosevelt DAHDA requested that Los DAHDA deliver three pounds of high grade

---

[4] This is the residence of David MONEYMAKER and Jacy J. HURST-MONEYMAKER and is the address Roosevelt DAHDA listed as his residence to the U.S. Probation Office.

marijuana to an unidentified customer.  Los DAHDA asked, "You, giving him five right?"  Roosevelt DAHDA corrected him, "No, just give him three."  Roosevelt DAHDA later told Los DAHDA, "What uh, what, what fucking names you got there if you got that fuck in, huh, any of that that SD[5] left, whatever definitely throw that in there."  Los DAHDA stated, "Yeah, I'm giving him one of those and CD, I got two more SDs left, but I. . ."  Roosevelt DAHDA directed Los DAHDA, "Give him all three and give him two GDs, 'cause you don't like them mother fuckers no way do you?"  Roosevelt DAHDA later asked Los Rovel DAHDA, "Tell him it's forty three fifty a piece if he wants them."  Los DAHDA agreed to meet the customer at Gran-Daddy's Barbeque in Lawrence, Kansas.

D. At 6:29 p.m., Roosevelt DAHDA again utilized HURST's direct connect/push-to-talk cellular telephone and talked to Los DAHDA.  Roosevelt DAHDA said, "Hey, he had nineteen fifty for you or nineteen. I had to go through it, I gave him two, he's not leaving until Thursday.  He wants to meet up again on Wednesday and get five."  I conducted physical surveillance in connection with the intercepted calls and observed two vehicles leave the south parking lot of Gran-Daddy's Barbeque at approximately 6:29 p.m.  I recognized one of the vehicles to be used by Los DAHDA.

E. Based upon training, experience and knowledge of this investigation, I believe HURST provided Roosevelt DAHDA the cellular telephone, which was used to

---

[5] Based upon training, experience and knowledge of this investigation, I have learned that high grade marijuana has many different strains and these strains are identified by name and/or initials, such as, BK-Bubba Kush, SDX, Silver Haze-SH, SD, GD and PK-Purple

direct Los DAHDA to distribute two pounds of high grade marijuana, priced at $4,350.00 per pound and the collection of either $19,500.00 or $19,000.00 in U.S. currency, which was payment for previously distributed high grade marijuana.

6. On January 31, 2012, at 8:07 p.m., Roosevelt DAHDA confirmed he and HURST where together in California when he again used Amos HURST's cellular telephone and spoke to Los DAHDA who utilized TARGET TELEPHONE #4. Roosevelt DAHDA told Los DAHDA that he was stopped north of "Bakersfield" by a sheriff's deputy. Roosevelt DAHDA explained the deputy checked his driver's license, insurance and registration. Roosevelt DAHDA advised he used a southern drawl when he spoke to the deputy. Roosevelt DAHDA added, "Clown said 'uh, bro you got country as hell,' 'You, uh you working around here?' 'No sir, just traveling.'" I know through experience that HURST is also known as "Clown." I have determined that Roosevelt DAHDA has secured a Kansas driver's license in his brother's name, which he will use in order to avoid detection by law enforcement because he is currently of supervised release through the District of Kansas for a prior federal narcotic convictions.

7. On February 1, 2012, at 7:59 p.m., TARGET TELEPHONE #4 received an incoming call from Roosevelt DAHDA who utilized s HURST's cellular telephone. Roosevelt DAHDA told Los DAHDA, "I said, I was just letting you know, I don't know, I don't know how to fucking pop the top. I was just letting you know." Los DAHDA replied, "Um, you'll have to holler at Spiderman and have him, have him meet up with his

Kush.

boy." Roosevelt DAHDA stated, "Alright, I will do that tomorrow then, unless you want me to take care of that tonight." I believe based upon training, experience and knowledge of this investigation, that Roosevelt DAHDA and Los DAHDA agreed not to open the truck's false compartment until February 2, 2012.

8. On February 2, 2012, at 2:28 p.m., Los DAHDA utilized TARGET TELEPHONE #4 and spoke to Roosevelt DAHDA, who utilized Phillip ALARCON's direct connect/push-to-talk cellular telephone 117*306*144, (sessions #183 and184). Los DAHDA and Roosevelt DAHDA again discussed opening the truck's false compartment as Los DAHDA prepared to fly from Kansas to California. Roosevelt DAHDA asked Los DAHDA, "Alright, I see you when you get here. You want me to wait, you want me to wait to pop that or, go ahead and do it now?" Los DAHDA asked Roosevelt DAHDA, "You get a hold of him?" Roosevelt DAHDA replied, "No, I don't have my phone with me." Los DAHDA later told Roosevelt DAHDA, "Might as well pull mine out too, just um, just, bring, take mine back other there, uh, where he's at whatever. You, uh, just hold on to it for me, just take it all out or you can just take it back to the crib, whatever." Los DAHDA clarified his instructions to Roosevelt DAHDA, "I want you to have him holler at W, whatever and they just, uh, take everything out of there, whatever, give him his and take mine out too and just leave it other there too. Don't leave it with them, but leave it at the house, new house." Roosevelt DAHDA stated "Alight."

9. On February 2, 2012, at 2:32 p.m. Los DAHDA utilized TARGET TELEPHONE #4 and spoke to ALARCON who utilized direct connect/push-to-talk cellular telephone 117*306*144 (session #191). ALARCON asked Los DAHDA, "Hey you want me to

15

schedule that for tomorrow pickup?  You said, it'll be early or you want to just wait til

Monday?"  Los DAHDA asked, "Who, for who?"  ALARCON advised, "For you, for

Wayne's, uh, shop."  Los DAHDA advised, "Fuck no, uh, I'm not even ready, dog."

ALARCON stated, "You said holler at him, I don't know.  I'm asking you what you

want me still for Monday then, right?"  Los DAHDA clarified, "I didn't want you to

holler at him, holler at him, like that.  I want you to holler at him, so you guys can go

over there and pop the top."  Los DAHDA responded, "Naw, you guys might as well

wait til I get there.  I, I'll do it when I get there, don't do anything til I get there."

ALARCON agreed to wait for Los DAHDA.

10. From February 1, 2012 through February 6, 2012, DEA TFO John Hanson and DEA

TFO Chuck Cottengim conducted physical surveillance of Los DAHDA, Roosevelt

DAHDA, PICKEL, ALARCON and Jeffery David PAIVA, in and around Hayward,

California.  Investigators conducted surveillance of ALARCON's residence, 2845

Dune Circle, Hayward, California, and recorded at least two meetings, which are

believed to have been criminal in nature.  On February 4, 2012, PAIVA arrived at

ALARCON's residence and was observed removing two large black duffel bags,

which appeared to be heavy and approximately three quarters full, but when he left

the residence approximately thirty two minutes later the black duffel bags were

empty.  Based upon training, experience and knowledge of this investigation, I have

learned high grade marijuana is placed in duffle bags, sacks and/or boxes to

conceal the controlled substances when they are moved from vehicle, residences

and businesses.

11. On February 8, 2012, at 7:32 p.m., TARGET TELEPHONE #1 received an incoming call from Wayne SWIFT who utilized cellular telephone (913) 238-8257 (session #1527). SWIFT initially asked Los DAHDA if he was busy. Los DAHDA advised he was not. SWIFT stated, "Oh, okay, go ahead and come through bro." Los DAHDA advised he would. SWIFT added, "That way I can get to, get to working on those things for us." Los DAHDA stated, "Okay, I'll be right there." Based upon knowledge of this investigation, I believe Los DAHDA met SWIFT at California Connections, 25017 Viking Street, Hayward, California, where Los DAHDA and SWIFT placed high grade marijuana into boxes, which they placed inside a four foot by four foot shipping crate to be shipped to Kansas.

12. A DEA administrative subpoena was served on ESTES Express Shipping Company. I reviewed a copy of a Bill of Lading dated February 9, 2012, which showed that two crates, with a total shipping weight of 1,100 pounds, were sent to California Connections, 4521 Metropolitan Avenue, Kansas City, Kansas,[6] from California Connections in Hayward, California. I know through this investigation the minimum shipping weight accepted per crate is 550 pounds. ESTES' shipping records also show that on February 13, 2012, that PARK picked up the crates from ESTES shipping in Kansas City, Kansas. PARK provided his Kansas Driver's License and a copy was made identifying him as the person who picked up the two crates. Investigators reviewed video footage from a pole camera positioned on CCI Motorsports. On February 13, 2012, at approximately 1:40 p.m., a four foot by four

---

[6] Peter PARK's company CCI Motorsports is located at 4521 Metropolitan Avenue, Kansas City, Kansas.

foot wooded shipping crate was observed in the back of a red pickup truck, which was backed into CCI Motorsports.

13. On February 13, 2012, two calls were intercepted regarding the delivery of controlled substances, believed to be high grade marijuana to/from TARGET TELEPHONE #1 and TARGET TELEPHONE #4. The intercepted conversations were between Los DAHDA and PARK, who utilized two different cellular telephones.

A. On February 13, 2012, at 12:02 p.m., Los DAHDA utilized TARGET TELEPHONE #1 and called PARK's cellular telephone (913) 238-7525 (session #1816). Los DAHDA confirmed he had returned from California. Los DAHDA advised he did not get off work until 5:30 p.m., but would send his "secretary"[7] to meet with PARK. PARK advised he did not think that would be a good idea. Los DAHDA agreed not to send his "secretary and advised he would meet PARK after work. PARK asked, "You know tonight, that's no problem, uh, I'm gonna go ahead and get my wheels out of, out of one of 'em. Okay and I'm not, not gonna open nothing up, but mine okay." Los DAHDA replied, "Yeah, they should be labeled though. I think all of mine, mine all are, okay?" PARK confirmed, "So I'm just letting you know. Oh, what's up that things bad ass it goes side to side. Okay, so yeah just hit me up on your way okay?" Based upon training, experience and knowledge of this investigation, I know drug trafficker's routinely use coded words to describe controlled substances and I have learned that PARK routinely uses the word "wheels" as a code for high grade marijuana.

---

[7] I have learned through this investigation, that Los DAHDA, Roosevelt DAHDA and others routinely referred to Sadie BROWN as the DAHDAs' secretary.

B.  On, February 13, 2012, at 6:07 p.m., (session #273) and at 6:45 p.m., (session #275), Los DAHDA utilized TARGET TELEPHONE #4 to call PARK's direct connect/push-to-talk cellular telephone IMSI 316010164908404.  Los DAHDA told PARK, "I'm on my way.  I got held up at work, but leaving now."  PARK confirmed he would wait for Los DAHDA.  Thirty eight minutes later Los DAHDA again spoke to PARK and confirmed he had arrived.  PARK stated, "Okay, pull up on the, uh, uh the first garage, okay?"  Los DAHDA stated, "Alright."

C.   Investigators conducted physical surveillance of Los DAHDA, who drove to CCI Motorsports, in his white Chevy pickup truck.  Investigators did not see any items in the truck's bed as it traveled from Lawrence, Kansas to CCI Motorsports. After Los DAHDA spoke to PARK, who directed Los DAHDA to pull into the garage, the truck was backed into the garage.  Approximately one hour later the white Chevy truck emerged from the garage and Los DAHDA drove to his property, 3324 East 12th Street Kansas City, Missouri, which Los DAHDA and others refer to it as "The Castle."[8]  Investigators were able to observe a crate in the bed of the truck as it traveled from CCI Motorsports to "The Castle."  Los DAHDA's truck was driven into "The Castle's" garage.  After approximately forty five minutes, Los DAHDA drove the truck out of the garage and returned to

---

[8] Based upon training, experience and knowledge of this investigation, investigators believe Los DAHDA and Roosevelt DAHDA store controlled substances and/or U.S. currency at "The Castle." Investigators have also learned through intercepted conversations that Los DAHDA has described The Castle as being "fortified," with such features as a 250 lb. solid cement door, metal door frames, interior and exterior security camera systems, which can be viewed remotely, and sophisticated remote/heavy duty door locks.  Based upon training, experience and knowledge of this investigation, it is believed The Castle is a stash house for controlled substances and/or U.S. currency.

Lawrence, Kansas. Investigators observed the bed of the truck after it emerged

from the garage and determined the crate was no longer in the bed of the truck.

14. On February 16, 2012, at 8:11 p.m., Los DAHDA utilized TARGET TELEPHONE #4

to contact Roosevelt DAHDA, who was using TARGET TELEPHONE #6 (session

#295, 300, 301 and 302). Los DAHDA and Roosevelt DAHDA discussed their

speeds, lane changes and traffic as they drove their vehicles from The Castle to

Lawrence, Kansas as they transported high grade marijuana and/or U.S. currency

to Lawrence, Kansas.

15. On February 17, 2012, investigators conducted physical surveillance of Roosevelt

DAHDA, who drove Los DAHDA's black Dodge dually pickup. At approximately

10:20 a.m., Roosevelt DAHDA stopped at a residence located at 2725 Lawrence

Avenue, Lawrence, Kansas. Roosevelt DAHDA entered the residence and he was

not carrying anything in his hands. Approximately ten minutes later, Roosevelt

DAHDA and a Hispanic male later identified as Mark ROMERO, Jr. exited the

residence. As both subjects walked towards the driveway, Roosevelt DAHDA

carried an unknown item in his hand. Roosevelt DAHDA and ROMERO had a

conversation near the black Dodge truck and Roosevelt DAHDA removed a blue

pillowcase from inside the driver's side of the truck bed of the Dodge truck. It

appeared the blue pillowcase was concealed between the side of the truck's bed

and an auxiliary fuel tank/tool box and it appeared to contain a square shaped

object. Roosevelt DAHDA handed the pillowcase and the contents to ROMERO.

At approximately 10:40 a.m., Roosevelt DAHDA left in the Dodge truck. ROMERO

carried the pillowcase and the contents into the residence. Based upon training,

experience and knowledge of this investigation, I believe the pillowcase contained controlled substance, which was distributed by Roosevelt DAHDA to ROMERO. Roosevelt DAHDA drove from Lawrence, Kansas to Wichita, Kansas, where agents have determined he routinely delivers high grade marijuana.

16. On March 14, 2012, at 6:16 p.m., Roosevelt DAHDA received a call on TARGET TELEPHONE #5 from VILLEAREAL, who utilized his cellular telephone (785) 393-8874. (session #2584) Roosevelt DAHDA and VILLEAREAL had a guarded/coded conversation regarding meeting on March 19, 2012, to arrange the purchase of controlled substances and a partial payment of money for the controlled substances.

A. VILLEAREAL explained he wanted to have a face to face meeting with Roosevelt DAHDA.  VILLEAREAL explained, "I was gonna talk to you and sit down and try to talk to you, shit man and try to start work, working out, working out a little plan and shit for the Jew."[9]  Later in the conversation, VILLEAREAL said, "Like I said, it'll be a little bit easier for me.  I'm seeing if I could maybe put a few hours in to to, to, to get things going a little bit more."  Roosevelt DAHDA stated, "Yeah." VILLEAREAL explained, "A little something for him for sure on uh, on Monday." Roosevelt DAHDA replied, "Cool."  VILLEAREAL added, "I mean some Benjamins, probably at least, at least a rack." Roosevelt DAHDA answered "Okay, that is cool." VILLEAREAL continued, "If, uh, you can talk to him and try to get something to work or get some hours put in, it'll, it'll speed the

9  Based upon training, experience and knowledge of this investigation, I believe the "Jew" and "him" to be Los DAHDA.

21

process up." Roosevelt DAHDA acknowledged he understood.

B. Based upon training, experience and knowledge of this investigation, I know that "work" and "hours" are common slang terms used to describe controlled substances to be distributed. "Benjamins" is a common term used to describe U.S. currency - Benjamin Franklin's portrait is on $100.00 bills, and, a "rack" is a common term used to describe $1,000.00. Based upon training, experience and knowledge of this investigation, I believe VILLEAREAL advised Roosevelt DAHDA that he wanted to obtain controlled substances for distribution and he wanted to be fronted (on consignment) additional controlled substances, which would allow him to distribute more controlled substances faster, thus making more money faster. VILLEAREAL advised he would pay a $1,000.00 as a down payment for the fronted controlled substances, by referencing "work or get some hours put in, it'll, it'll speed the process up" and "I mean some Benjamins, probably at least, at least a rack."

C. On March 27, 2012, at 2:39 p.m., Roosevelt DAHDA utilized TARGET TELEPHONE #5 to call VILLEAREAL's cellular telephone (785) 393-8874. (session #3203) VILLEAREAL had a guarded/coded conversation regarding a meeting with customers and later meeting with Roosevelt DAHDA. Roosevelt DAHDA asked VILLEAREAL, "What's up with you?" VILLEAREAL replied, "Not shit, not shit, just chilling waiting on these fools to get off work." Roosevelt DAHDA asked, "What time down you want to meet up later?" VILLEAREAL advised, "Uh shit, I got to go down there, I'll probably go down there, I'll probably head down there, close, close to five, cause two of my boys get off at five, five,

five thirty. So, then shortly after that, I, I only got to see Darren for, uh, shit ten minutes." Later in the conversation Roosevelt DAHDA told VILLEAREAL, "Uh, just hit me up and let me know when you are ready. I don't know where I'll be." Based upon training, experience and knowledge of this investigation, I believe VILLEAREAL explained to Roosevelt DAHDA that he needed to collect money from three individuals and agreed to meet Roosevelt DAHDA later in the evening. Roosevelt DAHDA confirmed he understood when he stated, "Let me know when you are ready."

D. On March 27, 2012, at 7:17 p.m., Roosevelt DAHDA utilized TARGET TELEPHONE #5 to call VILLEAREAL's cellular telephone (785) 393-8874. (session #3227)  VILLEAREAL and Roosevelt DAHDA agreed to meet at VILLEAREAL's residence. I conducted physical surveillance of VILLEAREAL's residence, 8621 West 131st Terrace Apartment #1311, Overland Park Kansas, and observed Roosevelt DAHDA and BROWN arrive and enter VILLEAREAL's residence shortly after the intercepted call. Roosevelt DAHDA entered the residence with a dark colored bag, which appeared to be empty. After approximately thirty minutes, Roosevelt DAHDA and BROWN exited the residence and BROWN carried the same dark colored bag, which appeared to contain something. Based upon the knowledge obtained through this investigation, I believe Roosevelt DAHDA received money from VILLEAREAL and the money was concealed in the bag.

17. On March 15, 2012, I learned through a series of intercepted calls that Los DAHDA and Roosevelt DAHDA planned to travel to Arkansas because of the death of their

23

grandmother. I also learned that Los DAHDA and Roosevelt DAHDA agreed to pay $2,000.00 for part of their grandmother's funeral expenses.

A. On March 16, 2012, at 8:36 p.m., Roosevelt DAHDA utilized TARGET TELEPHONE #8 to call BROWN who utilized TARGET TELEPHONE #6, (session #33). Roosevelt DAHDA asked BROWN, "How much do we have in the fucking safety deposit box?" BROWN replied, "Seventy, seventy one." Roosevelt DAHDA added, "Alright, keep tabs on everything so we know what it looks like when I get back," which BROWN acknowledged she would. Based upon training, experience and knowledge of this investigation, I believe BROWN and Roosevelt DAHDA used coded/guarded language to discuss the amount of high grade marijuana - "seventy, seventy one" pounds - that was stored at The Castle. Roosevelt DAHDA and Los DAHDA are multi-pound dealers of marijuana and in prior interceptions they have stated numbers as quantities to be distributed, but not weights, so it is my belief that unless a weight is stated the default weight of high grade marijuana to be sold is in pound quantities. Also, based upon training, experience and knowledge of this investigation, I believe "safe deposit box" is a reference to a secure room built inside The Castle.

B. On March 18, 2012, at 7:09 p.m., BROWN utilized TARGET TELEPHONE #6 to call ROMERO, who utilized cellular telephone (785) 218-2435. BROWN asked ROMERO, "Is it okay if I stop through real quick?" ROMERO advised, "Yeah, I'm ready to go." Based upon training, experience and knowledge of this investigation, I believed BROWN agreed to meet with ROMERO, to pickup U.S currency and/or deliver high grade marijuana.

C. On March 19, 2012, at 7:13 p.m., TARGET TELEPHONE #6 received an incoming direct connect/push-to-talk cellular telephone call from TARGET TELPEHONE #8 (sessions #46, #47 and #48), which was utilized by Roosevelt DAHDA.   BROWN asked Roosevelt DAHDA, "Hey, which two do you want me to give up?"  Roosevelt DAHDA made a sexual comment/joke about BROWN and her boyfriend then added, "Make sure that purps one of them."  BROWN stated, "Alright."  Roosevelt DAHDA then confirmed, "You're talking about Mark right."  BROWN stated, "Yes, sir."  Roosevelt DAHDA advised, "Yeah, give him a purp and a green tray," which BROWN acknowledged she understood. Roosevelt DAHDA added, "Let me know what he gives you, whatever and we'll fucking, ah, go over the books when I get back," which BROWN acknowledged she understood.   Based upon training, experience and knowledge of this investigation, I believe Roosevelt DAHDA directed BROWN to deliver two pounds of high grade marijuana to ROMERO and to collect any U.S currency for previously distributed high grade marijuana.   I have learned that high grade marijuana has many different strains, which are given names and I believe Roosevelt DAHDA's reference to "purp and green tray" to be references to two different strains of high grade marijuana distributed to ROMERO.

18. On March 26, 2012, Stephen RECTOR drove his 2008 white pickup, eastbound on I-80 highway.  RECTOR and his passenger, David SCHENK, were stopped after RECTOR committed a traffic infraction by Utah Highway Patrol Officers.   Officers obtained consent to search RECTOR's vehicle and located a hidden compartment in the truck's auxiliary fuel tank/tool box which contained approximately forty pounds

of high grade marijuana. Highway Patrol officers located receipts in RECTOR's
vehicle, which indicated RECTOR and SCHENK had been in San Francisco on
March 24-25, 2012.

A.  DEA TFO Cottengim reviewed court authorized GPS ping information regarding
the location of Chad BAUMAN's cellular telephone.  The information showed
that on March 28, 2012, at approximately 1:02 a.m. and 1:33 a.m., BAUMAN's
cellular telephone was at Terminal B at the Kansas City International Airport.
Additionally, DEA TFO Officer Cottengim reviewed Southwest Airlines records for
RECTOR, which were obtained through administrative subpoena, and records
indicated RECTOR arrived at the airport on Southwest Airlines at approximately
12:55 a.m.  It has been determined that RECTOR obtained his truck from
BAUMAN.

19. On March 28, 2012, investigators conducted physical surveillance of BAUMAN and
observed him briefly stop at Parkway Storage in Lawrence, Kansas, where he
accessed a storage unit.  DEA TFO Cottengim previously identified the storage unit
as a potential location, where controlled substances, high grade marijuana, and/or
U.S. currency were stored. Records from Parkway Storage show Carey WILLMING
was responsible for paying the rent for two storage units and bank records show
storage rental payments from a bank account for Ultimate Tan, a company owned
by BAUMAN and WILLMING.  BAUMAN used counter-surveillance techniques prior
to arriving and departing the storage facility.

A.  Investigators continued to follow BAUMAN, who drove his Ford pickup truck to
Olathe, Kansas, where he met Michael WITT at Olathe North High School.

26

Investigators observed BAUMAN remove three black trash bags from the bed of his pickup truck and place them in the bed of WITT's pickup truck. Investigators maintained surveillance of WITT until he left the school grounds, at which time he was stopped by a Johnson County, Kansas Sheriff's Department deputy after he committed a traffic infraction. WITT granted deputies consent to search his vehicle, at which time the three black trash bags, each containing nine vacuumed sealed packages of high grade marijuana, were seized. The sealed bags of high grade marijuana weighed approximately one pound each. WITT was interviewed by investigators post *Miranda* and provided a statement regarding the high grade marijuana, which he admitted he obtained from BAUMAN. WITT also advised he knew BAUMAN and RECTOR assisted each other in the distribution of controlled substances.

B. Investigators continued to follow BAUMAN after he placed the three black trash bags into WITT's truck and he traveled to 6398 Troost Avenue, Kansas City, Missouri, the location of a laundromat owned by Chad BAUMAN, where he was observed meeting with RECTOR.

C. Based upon training, experience and knowledge of this investigation by DEA and IRS, it is apparent that BAUMAN, WILLMING and RECTOR are partners in several businesses that appear to be used to launder money obtained through the distribution of high grade marijuana. A review of WILLMING's financial records, including a loan application completed on April 29, 2011, in which BAUMAN and WILLMING obtained financing in the amount of $629,000.00 from

27

Sunflower Bank for the construction of a new home at 1605 E. 550 Road, near Lawrence, Kansas, did not provide any legitimate income that produced cash receipts for WILLMING. WILLMING represented to the bank her employment was at Mutual Savings Bank, Eudora, Kansas and that she received, by electronic payment, $2,000.00 per month from her ex-husband, Don Willming. WILLMING did list as a bank account at United Missouri Bank (UMB), account number 9480195270, as an asset. A review of this account shows WILLMING deposited from 2008 through the end of available records in 2012, a total of $72,026.71 in cash. Nearly all the remaining deposits into this account were checks from Extreme Carpet Cleaning and Restoration totaling $13,000.00. During 2010, WILLMING's total deposits into the UMB account was greater than her take home pay from her employment, based upon a review of her W-2 and withheld taxes.

D. On or about April 7, 2011, WILLMING opened account number 61005541 at People's Bank, in Lawrence and made an initial deposit of $8,700.00 in cash. This account was opened as Fusion, Inc., dba Ultimate Tan. This account was not listed as an asset or a source of income for WILLMING on the loan application for 1605 E. 550 Road. The investigation has shown this is a tanning salon owned and operated by WILLMING.

E. The next deposit into the People's Bank account was on April 20, 2011, and it consisted of cash in the amount of $4,400.00 and a check from the State of Kansas in the amount of $75.00. On April 28, 2011, a check was written payable to Holiday Plaza Partnership with a memo of "deposit."

28

F. I believe, based on the volume of cash BAUMAN has at his disposal, that the initial two deposits came from drug proceeds. By starting a business with drug proceeds, the business is a place to conceal drug proceeds and launder drug money without the detection of law enforcement and the bank account contains laundered drug money. Once the business became operational and generated legitimate revenue, the business and business bank account at People's Bank contained commingled proceeds and laundered drug proceeds.

G. On August 16, 2011, Ultimate Tan had a withdrawal from the People's Bank account to Tan Marketing in the amount of $27,800.00. On the day prior to this withdrawal there were not sufficient funds to cover this withdrawal. On August 15, 2011, a check drawn on a Sunflower Bank account 2300217573 from CB Auto Sales, a business owned by BAUMAN, in the amount of $10,000.00, was deposited. Based on the above analysis of CB Auto Sales, IRS Special Agent Jeff Thomas believes this $10,000.00 represented laundered drug money.

The following chart shows total cash and total deposits from all sources into the People's Bank account:

| Year | Cash Deposits | Total Deposits | % of cash to total deposits |
|------|---------------|----------------|------------------------------|
| 2011 | $ 138,966.24 | $ 206,764.60 | 67% |
| 2012 | $  26,740.34 | $  86,345.76 | 31% |

Cash deposits for the year 2011 totalled $138,966.24 and of the total cash deposits, $103,657.79 were cash deposits made of an amount of $2,400 or greater. The cash deposits into this account are similar to cash deposits into

accounts owned by BAUMAN in that nearly all large cash deposits are made in conjunction with checks, not by themselves. On December 31, 2011, less than one year after being opened for business, Fusion, Inc. had a balance in the bank of $32,333.25.

H. A review of the bank account at People's Bank for Fusion, Inc., and after reviewing all records obtained throughout the investigation a loan has not been located that would have provided for startup costs for Fusion, Inc.

20. On April 16, 2012, at 1:40 p.m., PARK received an incoming call on TARGET TELEPHONE #9 from SWIFT who utilized cellular telephone (913) 238-8257 (session #2894). During the phone call SWIFT and PARK discussed what I believe to be a shipment of controlled substances, which would be shipped from Hayward, California, to Kansas City, Kansas. SWIFT stated, "As soon as he gets down here and then we're going to get it ready and then I'm gonna get it out tomorrow." Based upon knowledge of this investigation, I believe SWIFT was referring to James SODERLING as the person who he was waiting on to "get down here." SODERLING is a known high grade marijuana distributor and a high grade marijuana broker who lives in Fort Bragg, California. I know through training and experience that Fort Bragg, California is located in Mendocino County, California, which is located in Northern California, and is a known growing area for high grade marijuana.

A. On April 17, 2012, images from a pole camera located at California Connections Inc., 25017 Viking Street, Hayward, California, captured images of SWIFT

utilizing a forklift to load a wooden crate into an ESTES trucking company box truck.

B. On April 20, 2012, I received notification from ESTES trucking company that a crate had arrived in Kansas City, Kansas, and was scheduled to be delivered to CCI Motorsports, 4521 Metropolitan Avenue, Kansas City, Kansas, by no later than 12:00 p.m. on Monday, April 23, 2012. I was also informed that an employee of CCI Motorsports had called ESTES trucking company inquiring if the crate had arrived and inquired if it could be picked up on this date. I was told by ESTES personnel that the crate would be off loaded and would be available for pickup later in the day.

C. On April 20, 2012, at 9:58 a.m., PARK utilized TARGET TELEPHONE #9 to call Jacob FORBES on cellular telephone (785) 393-7155 (session #3304). PARK advised FORBES, "Hey, uh, um, I'll give you a call later, um, I think those used phones might be coming in today." FORBES replied, "That'd be awesome." PARK explained, "Yeah, so, but uh, uh, then it'd be like later on this evening, um." FORBES stated, "Just let me know. I'll get, I can get everything together." Later in the conversation PARK said, "If that's the case, I might not have it all nicely, you know, packaged up for your customers, but if um, I might still be able to do that, but if not you know?" FORBES stated, "If not man, I can deal with that part, um, because you know today's a holiday for a lot of." PARK said, "Yeah I know." Based on information obtained during this investigation, I know PARK uses coded/guarded language and I believe "phones" is coded/guarded language referencing high grade marijuana. I also know the numbers 4-20 and

31

the date April 20th are significant to users of marijuana, because it is often

celebrated as a holiday by supporters and users of marijuana and they will

celebrate the day with the consumption of marijuana.

D. Later that same day, at 2:06 p.m., PARK utilized TARGET TELEPHONE #9 to

call Charles KREISLER on cellular telephone (816) 522-7199. (session #3350)

PARK told KREISLER that ESTES trucking company informed him the crate

arrived at the Kansas City, Kansas distribution center and would be ready to be

picked up at 3 p.m.

E. At approximately 2:15 p.m., PARK utilized TARGET TELEPHONE #9 and again

called FORBES and stated, "Uh, he's, he's pretty close, so 4:00 or 4:30, um, let

me know like, how many you're looking at, uh, because I got to have it here, you

know at, at my clothing store today." FORBES stated, "Seven." Later in the

conversation PARK asked, "You know you can do it, you can come pick up 5 and

then you'd take a look at it you know, and then you know, bump it up if you want,

or whatever.   Just bring enough and then it's all up to you, you can take

whatever you want to take and stuff like that you know?" Jacob FORBES stated,

"Okay. Sounds good man."

F. At 2:27 p.m., PARK utilized TARGET TELEPHONE #9 to call Simon TYSON's

cellular telephone (913) 645-2372. (session #3356) PARK advised TYSON that

he would ready to meet him between 4:30 p.m. or 5:00 p.m. TYSON asked,

"Alright, what all will be there?  Are you going to have the Bubba too?"  PARK

stated, "It'll all be here dude, yes."  TYSON said, "Oh, I love you. No homo."

Later in the conversation PARK described the different types of high grade

marijuana he expected to have, "Oh, sh, well let's see. I mean, I hope, I mean, right now for the out is H, the uh, the designation HBK and then there's a called silver haze and the STX." TYSON ended the conversation, "Alright, bet, alright. Well, just call me when it's ready and we'll figure it out."

G.  On April 20, 2012 at approximately 3:30 p.m., investigators conducted physical surveillance at ESTES trucking company in Kansas City, Kansas and observed KREISLER arrive at the business. When KREISLER arrived at ESTES trucking company's shipping yard, his red pickup truck did not contain a large wooden shipping crate; however, when KREISLER left, investigators observed a large crate in the back of his red truck. Investigators followed KREISLER back to CCI Motorsports, where he removed the crate from the back of his pickup, with a fork lift and drove the crate inside CCI Motorsports where it is believed the controlled substances were removed.

H.  On April 20, 2012, at approximately 4:34 p.m., KREISLER was observed as he arrived at the Landing Mall, 1140 Meyer Blvd., Kansas City, Missouri, without the crate in the back of the truck. I know one of PARK's businesses, Fashion in Motion, is located inside the mall. Investigators observed KREISLER meet PARK in the parking lot where they unloaded three boxes from KREISLER's truck bed. I believe the boxes contained high grade marijuana. The boxes were taken inside Fashion In Motion by PARK and KREISLER.

1.  At approximately 5:00 p.m., investigators observed FORBES drive into the Landing/Fashion In Motion parking lot. FORBES entered the mall and a short time later he exited the mall carrying a black plastic bag, which he

placed in the front passenger compartment of his vehicle and drove away. Kansas City, Missouri police were notified about an outstanding felony arrest warrant for FORBES and he was stopped and arrested. A search of FORBES' vehicle incident to his arrest, revealed a vacuum sealed bag inside the black plastic bag which contained approximately one pound of high grade marijuana. The vacuum sealed bag had "HBK out" handwritten on the exterior of the bag in pink colored marker. Also inside the black plastic bag was $11,200.00 in U.S. currency.

2. At approximately 5:30 p.m., DEA TFO Chris Thomas returned to the Landing/Fashion In Motion parking lot after FORBES' vehicle was stopped. Approximately thirty minutes later TYSON exited the Landing/Fashion In Motion building and walked to his gray Infiniti vehicle. TYSON carried a black plastic bag, which looked similar to the black plastic bag FORBES carried from the business earlier. TYSON entered his vehicle and left the area.

3. At 7:32 p.m., PARK's TARGET TELEPHONE #9 received an incoming call from TYSON, who utilized cellular telephone (913) 645-2372. (session #2403). TYSON advised PARK, "Hey, uh, when you come, bring me another." PARK stated, "I got you." Later in the conversation TYSON stated, "I got, I got it all, it's already gone." Based upon knowledge of this investigation, I believe TYSON obtained high grade marijuana from PARK while inside the business, which was distributed and that TYSON called to obtain additional high grade marijuana.

34

21. On May 7, 2012, at 1:41 p.m., TARGET TELEPHONE #10 received an incoming call from Trent PERCIVAL, who utilized cellular telephone (913) 233-6837 and he spoke to PARK. (session #249)  PERCIVAL asked, "Do we have that, ah, that (U/I) filters available yet?"  PARK replied, "Well, I know I got, ah, well here's the thing man.  I got in about thirty cases."  PARK later said, "Okay? I got to put at least, you know five or so aside, another five or so aside, I can do probably twenty."

  A.   I know through knowledge of this investigation that PARK uses terms, such as, "oil filters," "cases" and "pamphlets," when referencing controlled substance. I believe PARK had approximately thirty pounds of high grade marijuana left from the shipment that was received on May 5 and agreed to distribute twenty pounds to PERCIVAL.

  B.  Investigators conducted physical surveillance of PERCIVAL.  At approximately 5:30 p.m., Trent PERCIVAL arrived at another one of PARK's known business locations, 14046 West 107th Street, Lenexa, Kansas, in his white Honda CRV. At approximately 5:40 p.m., through the use of a pole camera closed circuit surveillance camera, PERCIVAL exited the business carrying a large box and black duffel bag, which he placed in the back of his vehicle.  PERCIVAL left the area.

  C.  Investigators conducted physical surveillance and followed PERCIVAL to Chad POLLARD's residence, 10025 Falcon Valley Drive, Lenexa, Kansas, where he met briefly with POLLARD.  After a few minutes PERCIVAL left POLLARD's residence and drove to The Price Chopper parking lot approximately four blocks from POLLARD's residence.  POLLARD then left his residence driving his white

Mercedes Benz sport utility vehicle and drove to the Price Chopper Parking lot. PERCIVAL and POLLARD sat in their vehicles for several minutes and then drove across the street to the CVS parking lot.

1.  PERCIVAL removed the large box from the back of his vehicle and placed it in the back of POLLARD's vehicle. Investigators observed POLLARD as he drove to a business complex located at 21957 West 83rd Street, Lenexa, Kansas. The garage door of the business was opened by an unidentified male subject. After a short time, POLLARD drove away from the business but returned a short time later.

2.  Through additional intercepted calls between PERCIVAL and PARK, investigators learned that POLLARD originally only purchased ten of twenty pounds. POLLARD returned to the business location to collect the unsold high grade marijuana. POLLARD drove back to the CVS parking lot where he met with PERCIVAL. PERCIVAL entered POLLARD's vehicle and sat in the front passenger seat. After a few minutes, PERCIVAL exited the vehicle, walked to his vehicle and placed a small bag behind the driver's seat of his vehicle. POLLARD then removed the large box from his vehicle and placed it in the back of PERCIVAL's vehicle. Trent PERCIVAL then left the area.

3.  During prior conversations between PERCIVAL and PARK, PERCIVAL told PARK he had a new customer, who he referred to as "border warrior," who was interested in purchasing substantial quantities of the high grade marijuana. Based upon those interceptions, surveillance and knowledge of

this investigation, it is believed that POLLARD was the customer PERCIVAL had referenced to PARK.

22. On May 14, 2012, at 9:00 a.m., PARK received an incoming call on TARGET TELEPHONE #9 from Justin Jerome MERCER, who utilized cellular telephone (913) 231-7114. (session #10078) MERCER and PARK used guarded language to arrange a meeting, so MERCER could obtain controlled substances. MERCER asked PARK, "What's up?" PARK stated, "Nothing dude, just getting ready." MERCER asked PARK, "Uh, we going to the new place or the old place." PARK informed MERCER, "Well, uh, go to the new place." MERCER agreed to meet PARK at PARK's business located at 14046 West 107th Street, Lenexa.

A. Investigators conducted physical surveillance and at approximately 9:51 a.m., MERCER drove his 2004 black Honda Accord and arrived at the business park. At approximately 9:59 a.m., MERCER left the business park and drove from the area.

B. At 10:11 a.m., PARK received an incoming call on TARGET TELEPHONE #9 from MERCER. (session #10092) MERCER again used guarded/coded language to meet PARK to obtain controlled substances. MERCER asked PARK, "Nothing, did you already leave?" PARK stated, "No." MERCER stated, "I need to get that headband, I guess." PARK advised, "Okay." MERCER added, "For my workout, are you going home?" PARK explained to MERCER he was still at the business and MERCER said he would return to the business. Based upon knowledge of this investigation, I believe "headband" was code for high grade marijuana and/or a strain of high grade marijuana.

37

1. At approximately 10:17 a.m., MERCER returned to PARK's business and left the business park approximately seven minutes later.  Based upon training, experience and knowledge of narcotic investigations, I know "short stops" are indicative of narcotic distribution.

C. MERCER was followed to Lawrence, Kansas where he stopped in the Quick Trip parking lot, 1020 East 23rd Street, where he met Drew MERRIMAN at approximately 10:57 a.m.  Investigators observed MERCER and MERRIMAN talk briefly in front of the business.  MERRIMAN then walked to his vehicle, opened the passenger side door, leaned into the vehicle as if he was obtaining something and then walked to MERCER's parked vehicle with nothing in his hands.  MERRIMAN entered the vehicle's front passenger door and sat in the vehicle.  At approximately 11:12 a.m., MERRIMAN emerged from MERCER's vehicle and he had a U.S. Postal Service package.  MERRIMAN returned to his vehicle and drove to a residence located at 314 Michigan Street Lawrence, Kansas.  Based upon training, experience and knowledge of this investigation, I believe MERCER concealed high grade marijuana in the US Postal Service package, which was distributed to MERRIMAN.

D. Throughout the day MERCER and PARK had additional intercepted calls regarding the distribution of controlled substances and a delivery of U.S. currency to PARK.  Investigators conducted physical surveillance of MERCER, who returned to PARK's business in Lenexa, Kansas at approximately 4:50 p.m. He entered the business without anything in his hands and left the business approximately six minutes later carrying a black duffle bag, which appeared to

be full.   MERCER then drove back to Lawrence, Kansas, where he was kept under physical surveillance.

1.  At approximately 7:14 p.m., as Justin MERCER drove eastbound on K-10 highway he was stopped by Douglas County Sheriff's Corporal Jason Grems after committing a traffic infraction.  Corporal Grems contacted MERCER and detected the odor of raw marijuana coming from the vehicle.  Corporal Grems searched the interior of the vehicle and located several items including a small bag of marijuana, a large bag of marijuana, a blunt (cigar containing a mixture of marijuana and cigar tobacco) and $18,000.00 in U.S. currency in a purse belonging to Anne Aiken, who was a passenger in the vehicle.  MERCER and Aiken were not arrested and were allowed to leave the scene.

23. On May 22, 2012, at 3:40 p.m., SIEBER utilized his cellular telephone (913) 568-0146 and called TARGET TELEPHONE #10 and spoke to PARK.  SIEBER asked PARK, "Uh, um, grab another one of those gears?" PARK stated, "Okay." SIEBER then asked, "And, uh, maybe one of those headbands?"  PARK again stated, "Okay."  PARK and SIEBER agreed to meet on May 23, 2012, to complete the transaction. Based upon knowledge of this investigation, I know that PARK and his customers use coded language to include car parts when referencing high grade marijuana.  I have also learned that "headband" is a strain of high grade marijuana. I believe PARK agreed to distribute two pounds of high grade marijuana to SIEBER.

a.  On May 23, 2012, at 9:27 a.m., SIEBER again utilized cellular telephone (913) 568-0146 and called TARGET TELEPHONE #10 and spoke to PARK.  The two

agreed to meet in approximately forty five minutes.  SIEBER confirmed his order of "head band."

b.  I reviewed the images recorded from the pole camera set up to monitor CCI Motorsports on May 23, 2012.  At approximately 10:11 a.m., PARK arrived in his silver Dodge ram pickup and removed three black bags from his truck.  One bag appeared to possibly be a laptop computer bag, but the other two black bags appeared to be gym bags and appeared to be full.  At approximately 10:13 a.m., SIEBER arrived in his black pickup truck, removed a black gym bag from the cab of the truck and went into CCI Motorsports.  Approximately eight minutes later, SIEBER left the business with the black bag in his hand, returned to his vehicle and drove from the area.  Based upon training, experience and knowledge of this investigation, I believe SIEBER obtained high grade marijuana from PARK concealing it in the black gym bag.  During the course of the investigation there were numerous other occasions where SIEBER obtained multi-pounds of high grade marijuana from PARK.

24. On May 30, 2012, at 2:00 p.m., TARGET TELEPHONE #9 received an incoming call from Jason HANSEN who utilized cellular telephone (913) 972-0680.  (session #12469) HANSEN spoke to PARK in guarded language regarding meeting later in the day, after his friend got off work so he could obtain high grade marijuana. HANSEN told PARK, "I'm in wait mode.  I'm waiting."  PARK replied, "Okay." HANSEN explained, "Until, ah, my buddy doesn't get off work until five."  PARK stated, "Oh, okay and that's when you're going to come through?"  HANSEN said, "Yep, yes sir."

A.  Based upon training, experience and knowledge of this investigation, I have learned that comments like "going to come through" is an acknowledgement by the customer, in this case Jason HANSEN, they intended to obtain controlled substances.  I have learned through this investigation that PARK's business, Fashion In Motion is a women's and children's clothing store.

B.  On May 30, 2012, investigators conducted physical surveillance at the Landing Mall, 1140 Meyer Blvd., Kansas City, Missouri.  Through intercepted calls, investigators learned PARK was working at his Fashion in Motion store.  At approximately 5:05 p.m., HANSEN arrived at the mall in his 2004 gray Acura, which he parked near PARK's silver Dodge pickup truck.  HANSEN entered the mall with nothing visible in his hands.  At approximately 5:20 p.m., HANSEN exited the mall carrying a black bag in his left hand.  HANSEN walked directly to his vehicle, opened the truck and placed the bag into the truck.  HANSEN left the area.  Based upon training, experience and knowledge of this investigation, I have learned raw high grade marijuana has a very strong odor.  PARK, Los DAHDA and BAUMAN routinely place the high grade marijuana in two sealable bags in an effort to control the odor.  Based upon knowledge of this investigation, I believe the black bag contained high grade marijuana.

25. From April 6, 2012 through May 30, 2012, investigators intercepted thirty three calls between HANSEN who utilized cellular telephone (913) 972-0680 and TARGET TELEPHONE #9.  Based upon training, experience and knowledge of this investigation, I believe HANSEN worked as a direct distributor for PARK.  PARK

41

provided HANSEN with a cellular telephone[10] and keys to PARK's business, which was located in Lenexa, Kansas.

26. On May 21, 2012, at 5:11 p.m., HANSEN utilized cellular telephone (913) 972-0680 to call TARGET TELEPHONE #9 and spoke to PARK, who asked HANSEN, "Hey, did you want me to just leave those brochures there for you?" HANSEN explained to PARK he was currently at the Lenexa, Kansas business location. PARK advised he would arrive in approximately twenty minutes. HANSEN stated, "Oh, okay, yeah, just, yeah, just leave the 112 here for me." PARK stated, "Okay, hey I can't help it man, I mean you know, you usually got to give me the orders in the morning or whatever dude or." HANSEN stated, "Yeah I know, I know, I, I, I did this." Later in the conversation, PARK asked, "Okay, what you know, uh, you still have balance don't you on that what whatever you just picked up?" HANSEN stated, "No, I left it all sit, sitting right here." PARK then asked, "Okay. Well how much is the BW's or the B, B, BYs?" HANSEN responded, "Uh, four a piece." Based upon knowledge of this investigation, I believe "brochures" is coded language to describe controlled substances and BW and/or BY is coded/guarded language in regards to different strains of high grade marijuana. Based upon training, experience and knowledge of this investigation I have learned that high grade marijuana distributors will front (sale on consignment) the controlled substances and PARK's reference to "you still have a balance" is indicative of such an arrangement.

---

[10] Jason Hanson used the provided cellular telephone to call TARGET TELEPHONE #10 on April 6, 27, 28 and 29, 2012.

WHEREFORE, I believe the facts and circumstances related in the previous paragraphs constitute probable cause to believe that the individuals named herein, knowingly and unlawfully violated the Federal law noted above and as such request arrest warrants to be issued authorizing DEA, with appropriate assistance from other law enforcement officers, to arrest the named defendants.

MIKE E. McATEE
DEA-TFO Detective, Lawrence Police Department

Sworn to before me and subscribed in my presence this 11 day of June, 2012, at Kansas City, Kansas.

JAMES P. O'HARA
UNITED STATES MAGISTRATE JUDGE
District of Kansas

43

Penalties:

COUNT 1 –

- NLT 10 years and NMT Life Imprisonment,
- NMT $10,000,000.00 Fine,
- NLT 5 years S.R., and
- $100 Special Assessment.

In the event of a prior conviction for a felony drug offense:

- NLT 20 years and NMT Life Imprisonment,
- NMT $20,000,000.00 Fine,
- NLT 10 years S.R., and
- $100 Special Assessment.

In the event of two or more prior conviction for a felony drug offense:

- NLT 20 years and NMT Life Imprisonment,
- NMT $20,000,000.00 Fine, and
- $100 Special Assessment.