**FILED**

FEB 1 3 2013

Clerk, U.S. District Court
By_____Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | } |
| | } |
| Plaintiff, | } |
| | } |
| v. | } No. 12-20083-16-KHV |
| | } |
| TRENT JORDAN PERCIVAL, | } |
| | } |
| Defendant. | } |

## PLEA AGREEMENT

The United States of America, by and through Assistant United States Attorney, Terra D. Morehead, and Trent Jordan Percival, the defendant, personally and by and through defendant's counsel, Gregory C. Robinson, hereby enter into the following plea agreement pursuant to Rule 11 of the Federal Rules of Criminal Procedure:

1. **Defendant's Guilty Plea.**   The defendant agrees to plead guilty to Count 1 of the Superseding Indictment charging a violation of Title 21, United States Code, §§ 846, 841(a)(1), (b)(1)(A)(ii) and (b)(1)(A)(vii) and 856 and Title 18, United States Code, Section 2, that is, Conspiracy to possess with intent to distribute and to distribute five kilograms or more of a mixture and substance containing cocaine, a controlled substance; to manufacture, to possess with intent to distribute and to distribute 1,000 kilograms or more of marijuana, a controlled substance; and, maintaining drug-involved premises in Kansas, Missouri and California.  By entering into this plea agreement, the defendant admits to knowingly committing this offense, and to being guilty of this offense.  The defendant understands that the maximum sentence which may be imposed as to Count 1 of the Superseding Indictment to which the defendant has agreed

to plead guilty is not less than 10 years and not more than life imprisonment, a $10,000,000.00

fine, not less than 5 years of supervised release, and a $100 mandatory special assessment.  The

defendant also pleads guilty to and agrees not to contest the criminal forfeiture allegation of the

Superseding Indictment.  Defendant further consents to the entry of a money judgment against

him in the amount of $16,985,250.00.  Defendant acknowledges and agrees that this

$16,985,250.00 figure represents the amount of proceeds obtained as a result of the conduct

charged in Count 1 of the Superseding Indictment.  The United States agrees that at the time of

sentencing it will move for dismissal of any remaining counts of the Superseding Indictment.

    **2.  Forfeiture of Assets**    A.    Defendant agrees to the imposition of a forfeiture

money judgment against him in the amount of $16,985,250.00.  Defendant acknowledges and

agrees that this $16,985,250.00 figure represents the amount of proceeds obtained as a result of

the conduct charged in Count 1 of the Superseding Indictment.  Defendant further agrees to the

forfeiture of the real and personal property set out in Attachment A to this Plea Agreement.

Defendant agrees that the property set out in Attachment A was used or intended to be used to

facilitate the commission of Count 1 and/or constitutes proceeds derived or obtained from the

commission of Count 1.  Defendant knowingly and voluntarily waives his right to a jury trial

regarding forfeiture, including a jury or court determination of the amount of the forfeiture

money judgment.  Defendant knowingly and voluntarily waives all constitutional, legal and

equitable defenses to the forfeiture of the property listed in Attachment A and the imposition of

the money judgment in any proceeding.  Defendant acknowledges and agrees that the forfeiture

of the property in Attachment A and the imposition of the forfeiture money judgment shall not be

deemed an alteration of Defendant's sentence or this agreement, and shall not be treated as

satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the Defendant in addition to forfeiture. Defendant agrees to the immediate entry of the preliminary order of forfeiture. Defendant further agrees that he will truthfully and accurately complete a financial disclosure form prior to sentencing and will list all of his assets and financial interests. Defendant agrees to sign any and all documents necessary to effectuate the forfeiture and transfer of his interest and possession in any property as satisfaction for the money judgement. Defendant freely, voluntarily, knowingly and intelligently waives any right to collaterally attack any matter in connection with this prosecution and sentence, including the forfeiture of assets and entry of a money judgment, including that the forfeitures imposed in this case constitute an excessive fine or punishment under the Eighth Amendment to the United States Constitution.

B.      The Defendant agrees that upon the entry of a Final Order of Forfeiture regarding the real and personal property identified in Attachment A to this Plea Agreement, the items listed, except for the firearms and ammunition, will be sold or liquidated by the United States and the net proceeds thereof will be applied towards the satisfaction of the $16,985,250.00 forfeiture judgment. Net proceeds means those proceeds remaining after deduction for costs associated with the seizure, custody, liquidation or sale of the property. In the event that the United States determines that the value of any particular property listed in Attachment A, is worth less than its seizure, custody, or disposition costs, the defendant agrees that United States may destroy or otherwise dispose of the property, including placing the property into official use, without further notice or obligation whatsoever owing to the defendant. Defendant agrees upon the entry of a

3

final order of forfeiture, all of the firearms and ammunition listed in Attachment A will be destroyed and no credit given towards the satisfaction of the forfeiture money judgment.

      **3.**     **Factual Basis for the Guilty Plea.**    The parties agree the facts constituting the offense to which the defendant is pleading guilty, which constitutes the evidence the Government would present if the case proceeded to trial, are as follows:

      See Attachment B and incorporated herein by reference.

      **4.**     **Application of the Sentencing Guidelines.**    The parties request that the United States Sentencing Guidelines (Guidelines) be applied by the Court to calculate the applicable sentence in this case and that a sentence consistent with the Guidelines be imposed by the Court. The defendant further waives any right to have facts that determine the offense level under the Guidelines alleged in an indictment and found by a jury beyond a reasonable doubt; agrees that facts that determine the offense level will be found by the Court at sentencing by a preponderance of the evidence and agrees that the Court  may consider any reliable evidence, including hearsay; and the defendant agrees to waive all constitutional challenges to the validity of the Guidelines. The parties further agree to request a sentence within the guideline range determined to be appropriate by the U.S. Probation Department and as approved by the Court.  In other words, the United States will not request a sentence in excess of the high end of the guideline range and the defendant will not request a sentence below the low end of the guideline range.  The parties understand this agreement binds the parties only and does not bind the Court.

      **5.**     **Relevant Conduct.**    The parties have agreed to the application of the Guidelines and therefore both the United States and the defendant understand that the conduct charged in any dismissed counts of the Superseding Indictment is to be considered as well as all other

4

uncharged related criminal activity as relevant conduct for purposes of calculating the offense

level for Count 1, in accordance with United States Sentencing Guidelines (U.S.S.G.) § 1B1.3.

      6.    **Government's Agreements.**    In return for the defendant's plea of guilty as set

forth herein, the United States Attorney for the District of Kansas agrees:

    a.    To not file any additional charges against the defendant arising out of the facts forming the basis for the present indictment;

    b.    To recommend the defendant receive a two (2) level reduction in the applicable offense level under U.S.S.G. § 3E1.1 for acceptance of responsibility. In addition, if the defendant's offense level is 16 or greater, the United States will move at the time of sentencing for the defendant to receive an additional one (1) level reduction for acceptance of responsibility because the defendant timely notified the government of his intention to enter a plea of guilty.

    c.    To recommend the defendant's offense level be reduced by two (2) additional levels, in the same manner as the reduction for acceptance of responsibility addressed by sub-paragraph b above, pursuant to the policy established by the United States Attorney for the District of Kansas concerning early pleas in this particular complex case and because the defendant promptly agreed to accept responsibility and scheduled and entered a plea in this case prior to the expenditure of the court's or the government's resources on pretrial litigation and within the time limit as specified by the Government.

    d.    To dismiss Count 96 which would have had the effect of the Court imposing a consecutive 5 year sentence. The Government's decision to dismiss this count, will be taken into consideration in the final assessment of the defendant's cooperation and the recommendation for a reduced sentence by the Government.

The government's obligation concerning its agreements listed in ¶ 6 are contingent upon

the defendant's continuing manifestation of acceptance of responsibility as determined by the

United States. If the defendant denies or gives conflicting statements as to his involvement,

falsely denies or frivolously contests relevant conduct that the court determines to be true,

willfully obstructs or impedes the administration of justice as defined in U.S.S.G. § 3C1.1 (or

willfully attempts to do so), or engages in additional criminal conduct, the United States reserves

the right to request a hearing to determine if the defendant has breached this agreement.

In the event the Court finds the defendant has breached this plea agreement or has

otherwise failed to adhere to its terms, the United States shall not be bound by this paragraph and

may pursue any additional charges arising from the criminal activity under investigation as well

as any perjury, false statement, or obstruction of justice charges which may have occurred.  The

defendant understands and agrees that in the event the defendant violates this plea agreement, all

statements made by the defendant subsequent to the execution of this plea agreement, any

testimony given by defendant before a grand jury or any tribunal or any leads from such

statements or testimony shall be admissible against the defendant in any and all criminal

proceedings.  The defendant waives any rights which might be asserted under the United States

Constitution, any statute, Federal Rule of Criminal Procedure 11(f), Federal Rule of Evidence

410, or any other federal rule that pertains to the admissibility of any statements made by the

defendant subsequent to this plea agreement.

7.     **Defendant's Agreements.**     The defendant agrees to cooperate fully and

truthfully with the United States as follows:

     a.     Defendant agrees to provide truthful, complete, and accurate information
and testimony in the trial of this matter, before any grand jury proceeding,
or in any related hearing;

     b.     Defendant agrees to provide all information concerning the defendant's
knowledge of, and participation in, the offenses charged in the indictment
and all related conduct;

c.   Defendant agrees that if the United States determines the defendant has not provided full and truthful cooperation, or has committed any local, state, or federal crime between the date of this plea agreement and his sentencing, or has otherwise violated any other provision of this plea agreement, [or has violated the terms and conditions of his release while on bond as required by the Court,] the plea agreement may be voided and the defendant shall be subject to prosecution for any federal crime of which the United States has knowledge including, but not limited to, perjury, obstruction of justice, and any substantive offenses arising from this investigation. Such prosecution may be based upon any information provided by the defendant during the course of the defendant's cooperation, or upon leads derived therefrom, and this information may be used as evidence against the defendant. In addition, the defendant's previously entered plea of guilty will remain in effect and cannot be withdrawn;

d.   Defendant agrees to fully and completely assist the United States in the identification and recovery of forfeitable assets, either domestic or foreign, which have been acquired directly or indirectly through the unlawful activities of the defendant, co-defendants, and/or co-conspirators and further agrees to not contest any forfeiture proceedings.

8.   **Substantial Assistance.**   The defendant acknowledges that substantial assistance has not yet been provided by the defendant within the meaning of U.S.S.G. § 5K1.1 and Title 18, United States Code § 3553(e). The defendant also acknowledges and understands that the determination as to whether the defendant has provided substantial assistance and whether a motion pursuant to U.S.S.G. § 5K1.1 will be filed are left entirely and exclusively within the discretion of the United States. If a determination is made by the United States the defendant has provided substantial assistance, the United States shall request that the Court consider reducing the sentence the defendant would otherwise receive under the applicable statutes and/or sentencing guidelines pursuant to Title 18, U.S.C. § 3553(e), Title 28, U.S.C. § 994(n), and U.S.S.G. § 5K1.1 and the defendant agrees not to seek a reduction beyond that recommended by the Government.

7

**9.    Sentence to be Determined by the Court.**    The defendant understands that the sentence to be imposed will be determined solely by the United States District Judge.  The United States cannot and has not made any promise or representation as to what sentence the defendant will receive.

**10.    Information Provided by Defendant.**    The United States agrees not to use new information the defendant provides about the defendant's own criminal conduct except as specifically authorized by U.S.S.G. § 1B1.8.  As such, this information may be revealed to the Court but may not be used against the defendant in determining the defendant's applicable guideline range or departing above his guideline range.  Defendant understands and agrees, however, that under U.S.S.G. § 1B1.8, there shall be no such restrictions on the use of the information:  (1) previously known to the United States; (2) revealed to the United States by, or discoverable through, an independent source; (3) in a prosecution for perjury or giving a false statement; (4) in the event there is a breach of this agreement; or (5) in determining whether and to what extent a downward departure as a result of a government motion pursuant to Title 18, U.S.C. § 3553(e) and U.S.S.G. § 5K1.1 is warranted.

**11.    Identification of Assets & Agreement Concerning Monetary Penalties:**    The defendant agrees to cooperate fully with the United States Attorneys Office and specifically:

A) Provide a financial statement on a form approved by the USAO that discloses all assets in which defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party, as well as any transfer of assets that has taken place within 3 years preceding the entry of this plea agreement.

B) Submit to an examination, which may be taken under oath and may include a polygraph examination.

C) Acknowledges that any waivers, consents, or releases signed by the defendant for purposes of the Presentence Investigation Report extends to the USAO.

D)  Will not encumber, transfer, or dispose of any monies, property or assets under his/her custody or control, without written approval from the USAO.

E) The defendant understands and agrees that, pursuant to Title 18, United States Code, Section 3613, whatever monetary penalties are imposed by the court will be due and payable immediately and subject to immediate enforcement by the United States. If the Court imposes a schedule of payments, the defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment.  If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments.

F) The defendant authorizes the U.S. District Court to release the funds posted as security for his/her appearance bond in this case to be applied to satisfy the financial obligations of the defendant, pursuant to the judgment of the Court.

G) The defendant waives any requirement for demand of payment on any fine, restitution, or assessment the District Court announces on the record the day of sentencing.

12.    **Withdrawal of Plea Not Permitted.**    The defendant understands that if the court accepts this plea agreement but imposes a sentence with which the defendant does not

agree, the defendant will not be permitted to withdraw this plea of guilty.

      **13.**    **Payment of Special Assessment.**   The defendant understands that a mandatory special assessment of $100 per count of conviction will be entered against the defendant at the time of sentencing.  The defendant agrees to deliver to the clerk of the court payment in the appropriate amount no later than the day of plea.  If the defendant fails to make full payment of the special assessment the United States will no longer be bound by the provisions contained in Section 6(b) of this agreement.  The burden of establishing an inability to pay the required special assessment lies with the defendant.

      **14.**    **Waiver of Appeal and Collateral Attack.**   The defendant knowingly and voluntarily waives any right to appeal or collaterally attack any matter in connection with this prosecution, the defendant's conviction, or the components of the sentence to be imposed herein including the length and conditions of supervised release, as well as any sentence imposed upon a revocation of supervised release.  The defendant is aware that Title 18, U.S.C. § 3742 affords a defendant the right to appeal the conviction and sentence imposed.  By entering into this agreement, the defendant knowingly waives any right to appeal a sentence imposed which is within the guideline range determined appropriate by the court.  The defendant also waives any right to challenge a sentence or otherwise attempt to modify or change his sentence or manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under Title 28, U.S.C. § 2255 [except as limited by *United States v. Cockerham*, 237 F.3d 1179, 1187 (10th Cir. 2001)], a motion brought under Title 18, U.S.C. § 3582(c)(2) and a motion brought under Fed. Rule of Civ. Pro 60(b).  In other words, the defendant waives the right to appeal the sentence imposed in this case except to the extent, if any, the court departs upwards

from the applicable sentencing guideline range determined by the court.  However, if the United

States exercises its right to appeal the sentence imposed as authorized by Title 18, U.S.C.

§ 3742(b), the defendant is released from this waiver and may appeal the sentence received as

authorized by Title 18, U.S.C. § 3742(a).  Notwithstanding the forgoing waivers, the parties

understand that the defendant in no way waives any subsequent claims with regards to ineffective

assistance of counsel or prosecutorial misconduct.

     **15.**   **Waiver of FOIA Request.**   The defendant waives all rights, whether asserted

directly or by a representative, to request or receive from any department or agency of the United

States any records pertaining to the investigation or prosecution of this case including, without

limitation, any records that may be sought under the Freedom of Information Act, Title 5, U.S.C.

§ 552, or the Privacy Act of 1974, Title 5, U.S.C. § 552a.

     **16.**   **Waiver of Claim for Attorney's Fees.**    The defendant waives all claims under

the Hyde Amendment, Title 18, U.S.C. § 3006A, for attorneys fees and other litigation expenses

arising out of the investigation or prosecution of this matter.

     **17.**   **Full Disclosure by United States.**   The defendant understands the United States

will provide to the court and the United States Probation Office all information it deems relevant

to determining the appropriate sentence in this case.  This may include information concerning

the background, character, and conduct of the defendant including the entirety of the defendant's

criminal activities.  The defendant understands these disclosures are not limited to the count to

which the defendant has pled guilty.  The United States may respond to comments made or

positions taken by the defendant or defendant's counsel and to correct any misstatements or

inaccuracies.  The United States further reserves its right to make any recommendations it deems

appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement.  The defendant also has the right to provide information concerning the offense and to make recommendations to the court and the United States Probation Office.

18. **Deportation Consequences**. Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which defendant is pleading guilty.  Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States.

19. **Parties to the Agreement.**    The defendant understands this plea agreement binds only the defendant and the United States Attorney for the District of Kansas, and that it does not bind any other federal, state, or local prosecution authority.

20. **No Other Agreements**.    The defendant has had sufficient time to discuss this case, the evidence, and this agreement with the defendant's attorney and defendant is fully satisfied with the advice and representation provided by defendant's counsel.  Further, the defendant acknowledges that he has read the plea agreement, understands it and agrees it is true and accurate and not the result of any threats, duress or coercion.  The defendant further understands that this plea agreement supersedes any and all other agreements or negotiations between the parties, and that this agreement embodies each and every term of the agreement

12

between the parties.  The defendant acknowledges that the defendant is entering into this

agreement and is pleading guilty because the defendant is guilty and is doing so freely and

voluntarily.


_Terra D. Morehead_                              Date: _Jan. 6, 2013_
Terra D. Morehead
Assistant U.S. Attorney
500 State Avenue, Suite 360
Kansas City, Kansas  66101
(913)551-6730
Ks.S.Ct. #12759


_Kim I. Martin_                                  Date: _1-8-13_
Kim I. Martin
Criminal Supervisor


_Trent Jordan Percival_                          Date: _02. 13. 2013_
Trent Jordan Percival
Defendant


_Gregory C. Robinson_                            Date: _2-13-13_
Gregory C. Robinson
Attorney for Defendant Trent Jordan Percival
400 N. Main
Lansing, Kansas 66043
(913)722-5800
Ks.S.Ct. #18960

ATTACHMENT A

1.  Contents of Sunflower Bank account # xxxxxx4052 in the amount of $24,718.47.

2.  Contents of Sunflower Bank account # xxxxxx7573 in the amount of $16,070.54.

3.  Contents of Sunflower Bank account # xxxxxxx2439 in the amount of $13,226.55.

4.  Contents of Sunflower Bank account # xxxxxx3386 in the amount of $10,578.39.

5.  Contents of Sunflower Bank account # xxxxxxx8022 in the amount of $8,592.35.

6.  Contents of Sunflower Bank account # xxxxxxx4034 in the amount of $2,853.41.

7.  Contents of Fidelity Brokerage Services LLC account #xxx-xx2873 in the amount of $25,012.81.

9.  Contents of Fidelity Brokerage Services LLC account #xxx-xx6740 in the amount of $10,005.75.

10. Contents of US Bank, NA, account # xxxxxxxx1133 in the amount of $15,700.95.

11. 2010 Ford F-350 Lariat Diesel, VIN: 1FTWW3BR9AEA72079.

12. $40,000.00 U.S. Currency, recovered from Bryan Janosik, Brad K. Beelman and Keith Kearns.

13. $6,000.00 U.S. Currency, recovered from storage unit located at 2179 American Avenue, Unit E, Hayward, California.

14. 2008 Ford E-250 Cargo Van, VIN: 1FTNE24W68DA83746.

15. $99,408.00 U.S. Currency seized from Chad Bauman and Carey Willming's residence.

16. $1,119.91 U.S. Currency seized from Chad Bauman and Carey Willming's residence.

17. 55 inch Samsung UN55ES8000F LCD Television, Serial #B5983CRZ1000572. .

18. 55 inch Samsung LCD Flat Screen Television, Serial #Z4QY3CYC200031M.

19. 55 inch Samsung UN55ES8000F LCD Television Serial #AZ4C3CFS405838M from Chad Bauman's residence.

20. 1993 Ford Mustang Cobra, VIN: 1FACP42DXPF186904.

21. ITT Night Enforce NEPVS14-17 Night Vision Scope, Serial #RS5502772.

22. 2012 Huskee 35 Ton Log Splitter, Serial #1H2401761.

23. Breitling Super Avenger GTS Watch with 3 buckle straps seized from Chad Bauman Carey Willming's residence.

24. 2011 Ford E-250 Cargo Van, VIN:  1FTNE2EW6BDA90881.

25. 2002 Ford F-350 Super Duty Flatbed Truck, VIN:  1FDWF36F02EC65248.

26. 2012 Chicago RCP7581V Pneumatic 80 Gallon 2 Stage Air Compressor, Serial #HOP265963.

27. 2011 Load Trail Goose Neck Low Profile Flatbed Hydraulic Trailer, VIN: 5L8GP3228B1020866.

28. 2010 Cat Skid Loader with attachments seized from Chad Bauman and Carey Willming's residence.

29. 2012 Siemens 45 Kilowatt 2.4 L Generator, Serial #6734213.

30. 1999 T&E Custom Built Car Hauler, VIN:  1T9500T33X1230433.

31. 1993 Ford Mustang Cobra, VIN:  1FACP42D3PF176246.

32. 2 Grasshopper Mowers, 725D riding mower and 928D riding mower seized from Chad Bauman and Carey Willming's residence.

33. 2003 12 Foot Eagle Trailer Flatbed, VIN:  4ET712S1931004780.

34. 2012 Ford F-450 Superduty Crew Cab, VIN: 1FT8W4DT4CEB89448.

35. Five Items identified as:  CAT Model A19 Two Bits; CAT Model Br172 Bush Hog; CAT Bucket Attachments; MDS Manufacturing Company Fork lift; CAT skid Loader.

36. Mossberg 500 Shotgun CAL: 20 SN: T375206.

37. Izhmash(Imez) Saiga Shotgun CAL:12, SN: H08420717.

38. Benelli, S.PA Super Black Eagle Shotgun CAL:12,  SN:U150118.

39. DMPS IN.c (Defense Procurement Mfg. Services) Panther LR-308 Rifle CAL:308

2

SN: 34846K.

40.     Benelli, S PA Nova Shotgun CAL:12,  SN: Z398217.

41.     Savage Arms Inc. (CD) 93R17 Rifle CAL:17, SN: 0366438.

42.     Benelli, S. PA Super Black Eagle II Shotgun CAL:12,  SN: U418788C.

43.     Norinco (North China Industries) MAK90 Sporter Rifle CAL:762,  SN: 9404038.

44.     Savage 820B Shotgun CAL:12, SN: none, seized from Chad Bauman and Carey Willming's residence.

45.     Lewis Machine and Tool Co. Defender 2000 Rifle CAL:556, SN: LMT36325.

46.     Remington Arms Company 700 Rifle CAL:7, SN: G7030961.

47.     Smith & Wesson 60 Revolver, CAL:357, SN: CFH6453.

48.     Franchi Renaissance Classic Shotgun CAL:12,  SN: 9012154.

49.     Israel Weapon IND-IWI (Israel Military IND-IMI) Desert Eagle Pistol CAL:44, SN:36204504.

50.     Smith & Wesson 642 Airweight Revolver CAL:38, SN: CDR9985.

51.     100 Rounds Assorted Ammunition, assorted caliber.

52.     Savage 110 Rifle CAL:270, SN: F397392.

53.     A tract of land located in the South Half of the Southwest Quarter of Section 27, Township 12 South, Range 18 East of the 6th P.M., in Douglas County, Kansas, more particularly described as follows:

> Beginning at the Northeast corner of the South Half of said Quarter Section for the point of beginning; thence West along the North line of the South Half of said Quarter Section, a distance of 600 feet; thence South, parallel to the East line of said Quarter Section, a distance of 410 feet; thence East, parallel to the North line of the South Half of said Quarter Section, a distance of 600 feet, more or less, to the East line of said Quarter Section; thence North along the East line of said Quarter Section, a distance of 410 feet, more or less to the Northeast corner of the South Half of said Quarter Section and the point of beginning; Douglas County PIN: 023-058-27-0-00-00-014.03-0.

3

54.     A tract of land located in the South Half of the Southwest Quarter of Section 27, Township 12 South, Range 18 East of the 6th P.M., in Douglas County, Kansas, more particularly described as follows:

> Beginning at the Northeast corner of the South Half of said Quarter Section; thence West along the North line of the South Half of said Quarter Section, a distance of 600 feet for a point of beginning; thence continuing West along the North line of the South Half of said Quarter section, a distance of 720 feet; thence South, parallel to the West line of said Quarter Section, a distance of 500 feet; thence East, parallel to the South line of said Quarter Section, a distance of 455 feet; thence South, parallel to the West line of said Quarter Section, a distance of 820 feet, more or less, to the South line of said Quarter section, thence East along the South line of said Quarter Section, a distance of 365 feet; thence North, parallel to the East line of said Quarter Section, a distance of 500 feet; thence West, parallel to the South line of said Quarter Section, a distance of 100 feet; thence North, parallel to the East line of said Quarter Section, a distance of 820 feet, more or less, to the North line of the South Half of said Quarter Section and the point of beginning;  Douglas County PIN: 023-058-27-0-00-00-014.07-0.

55.     A tract of land at 1605 E. 550 Road, Lawrence, Kansas, which is a tract of land in the South Half of the Southwest Quarter of Section 27, Township 12 South, Range 18 East of the 6th P.M., in Douglas County, Kansas, more particularly described as follows:

> Beginning at the Southeast corner of the Southwest Quarter of said Section 27; thence South 90°00'00" West along the South line of the Southwest Quarter of said Section 27 a distance of 498.40 feet; thence North 00°20'02" West a distance of 501.64 feet; thence South 89°57'35" West a distance of 100.11 feet; thence North 00°20'02" West a distance of 411.21 feet; thence North 89°55'10" East a distance of 598.51 feet to the East line of the Southwest Quarter of said Section 27; thence South 00°20'02" East along the East line of the Southwest Quarter of said Section 27 a distance of 913.62 feet to the point of beginning, a in Douglas County, Kansas;  Douglas County PIN: 023-058-27-0-00-00-014.01-0.

56.     A tract of land identified as 7341 S.W. 23rd Street, Topeka, Shawnee County, Kansas, more particularly described as:

> Part of Lot 1, Block B, WEST INDIAN HILLS SUBDIVISION NO. 11, in the City of Topeka, Shawnee County, Kansas, described as follows: Commencing at the Northwest Corner of said Lot 1; thence North 88 degrees 26 minutes 34 seconds East (meas) North 88 degrees 26 minutes 14 seconds East (plat) along the North line of said Lot 1, 48.21 feet to the Point of Beginning; thence continuing North 88 degrees 26 minutes 34 seconds East (meas) North 88 degrees 26 minutes

4

14 seconds East (plat) along the North line of said Lot 1, 41.25 feet to the Northeast Corner of said Lot 1; thence South 1 degree 31 minutes 54 seconds East (meas) South 1 degree 33 minutes 46 seconds East (plat) along the East line of said Lot 1, 115.16 feet (meas) 115.00 feet (plat) to the Southeast Corner of said Lot 1; thence South 88 degrees 24 minutes 23 seconds West (meas) South 88 degrees 26 minutes 14 seconds West (plat) along the South line of said Lot 1, 40.86 feet; thence North 1 degree 43 minutes 39 seconds West, 115.18 feet to the Point of Beginning.

57.     A tract of land identified as 1538 A Legend Trail Drive, Lawrence, Kansas, more particularly described as:

Parcel 19A (1538A Legend Trail Drive), as shown on a Plat of Survey for Lot 19, Block One, Legend Trail Addition, a subdivision in the City of Lawrence, Douglas County, Kansas, recorded in the office of the Register of Deeds in Douglas County, Kansas., in Book 825 at page 289.

# FACTUAL BASIS[1]
# ATTACHMENT B

## *Overview*

Starting in 2008, law enforcement received information that Los Rovell Dahda and his younger brother, Nathan Wallace were distributing marijuana and cocaine in Lawrence, Kansas. Los Dahda's sources of supply were said to be a Mexican national who lived in the Kansas City metropolitan area. Beginning in or about September 2011, the Lawrence/Douglas County Kansas Drug Enforcement Unit (DEU) along with the Drug Enforcement Administration (DEA) and other law enforcement agencies began an extensive investigation into drug trafficking activities of Chad Bauman and Los Dahda. Prior to the start of the directed investigation, DEU investigators conducted numerous seemingly unrelated high grade marijuana investigations, which occurred in Lawrence, Douglas County, Kansas. During these investigations, law enforcement developed several cooperating individuals who provided information about Chad Bauman and/or Los Dahda as sources of supply of high grade marijuana.

It is estimated that during the course of the conspiracy, conspirators profited $16,985,250.00 or more selling more than 1,000 kilograms of marijuana and 5 kilograms of cocaine. From the investigation, which included the seizure of physical evidence, court-authorized wire interceptions and statements made by cooperating individuals, law enforcement has learned that the organization was involved in manufacturing, possessing with the intent to distribute and distributing over 1,000 kilograms of marijuana and possessing with the intent to distribute and distributing five kilograms or more of cocaine from January 2005 through July 30, 2012. The conspiracy consisted of the following known individuals: Los Rovell Dahda, a/k/a Erick Carlos Wallace, a/k/a Liule (L); Roosevelt Rico Dahda, a/k/a Derick Rico Wallace; Sadie Jolynn Brown; Justin Cherif Pickel, a/k/a Frenchie; David James Essman, a/k/a Tiny; Amos Moses Hurst, a/k/a Moses, a/k/a Clown; Phillip Villereal Alarcon; Jeffery David Paiva; Mark Lee Romero; Samuel Villeareal, III; Peter Park, a/k/a Spiderman; Wayne Suhan Swift; Charles Thomas Kreisler, a/k/a Tommy; James Michael Soderling; Simon Andrew Tyson; Trent Jordan Percival; Chad William Pollard; Jason Marcus Hansen; Daniel Mark Sieber; Justin Jerome Mercer; Jacob Paul Forbes; Chad Eugene Bauman; Carey Lynn Willming; Michael Shane Witt; Stephen Mallsion Rector; Michael J. Berry; Adam Christiansen; Aaron C. Gunderson; Nathan Wallace: Ryan Kearns; Karl Havener; Damien J. Mick; Joshua Simpson; Sarah Soderling; Elizabeth Dominique Watson; Jean Francois Quintin; Steven Stegall; David G. Hale; Henry McCusker, a/k/a Hank; John Paul McMillan, a/k/a J.P.; Erin M. Keller; Jeffrey Wall and Richard W.

---

[1] This factual basis does not contain every fact or detail of this investigation. It does provide information pertaining to the various counts contained in the Superseding Indictment, in order to demonstrate various individuals' involvement in the conspiracy; however, it in no way represents every facet of each conspirators involvement in the conspiracy. There are many other uncharged, but relevant events that each and every coconspirator was involved in that have been documented by investigators.

Smith, Jr. There were many other individuals involved in the conspiracy, both known and unknown.

During the early period of time of this conspiracy, the marijuana acquired was obtained from Mexican and Canadian sources of supply. Bauman initially traveled to Texas in order to pick up Mexican marijuana and cocaine, but after several trips he started having it shipped to a business he had in Lawrence, Kansas. Bauman sold quantities of the Mexican marijuana and cocaine to Peter Park. Park, who was working with Wayne Swift, developed Canadian suppliers of marijuana who delivered it by airplane and vehicles to Peter Park and Wayne Swift at their business in Johnson County, Kansas. The deals were set up through Jean Francois Quintin, a/k/a "J.F.", who was a former professional Canadian hockey player who lived in the Kansas City area. Park would purchase the marijuana for $3,400.00 and distribute it for $3,800.00. Chad Bauman was originally a customer of Park and Swift, but later became more of a partner with them, so they could commingle their funds in order to obtain a better price. Bauman was assisted in his drug trafficking activities by his brother-in-law, Adam Christiansen. When they eventually quit dealing with J.F., they had an outstanding drug debt and owed J.F. for marijuana.

In approximately 2006, Bauman met Los Dahda, who began purchasing large quantities of marijuana from Bauman. Los Dahda was assisted in his drug trafficking efforts by his brothers, Wallace and Roosevelt Dahda. In approximately 2007, Bauman, Park and Swift began obtaining "high grade" marijuana from indoor and outdoor grow operations in California, which they continued to obtain until the end of the conspiracy, because they thought the Canadian prices were too high. The three first met with Steven Rector, who assisted in locating sources of supply in California. Wayne Swift eventually moved to California to better assist in the facilitation of transactions. The marijuana would be purchased on the front end from California for between $1,800 to $2,800/pound and then sold to others for between $3,500 to $4,800/pound. It is estimated that the quantity of high grade marijuana obtained throughout the conspiracy exceeded 8,000 pounds.

Investigators eventually obtained Court authorization to monitor wire interceptions of cellular phones utilized by Los Rovell Dahda. Through these interceptions, investigators identified Phillip Alarcon and Jeffery David Paiva, as individuals who were assisting Los Dahda in finding sources of supply of high grade marijuana in California and setting up the deals. Alarcon first began dealing with Bauman in 2009, who he met through Swift, and Alarcon supplied large quantities of marijuana to him and other conspirators. Alarcon also obtained cocaine for Bauman and was assisted on one of the occasions by Paiva in securing a quantity of cocaine from a source Paiva knew. Bauman introduced Los Dahda to Alarcon and Paiva and they also assisted Los Dahda in acquiring quantities of marijuana. Investigators were also able to determine that Justin Pickel would transport high grade marijuana from California for the Dahdas and he also set up an indoor grow operation in California that he was maintaining for them.

Investigators also obtained authorization to intercept wire communications for Sadie Brown and Roosevelt Rico Dahda. Through these interceptions, investigators were able to identify Brown as being a primary distributor of high grade marijuana and a money collector/courier for the Dahdas. Samuel Villeareal, III was identified as a pound quantity customer of the Dahdas. Investigators also obtained authorization to intercept wire communications of cellular phones utilized by Peter Park. Through these interceptions investigators identified James Michael Soderling, who lived in California along with his wife, Sarah Soderling, as being a source of supply/broker for high grade marijuana, who Park met through Justin Mercer. Mercer and Park purchased quantities of marijuana from the Soderlings. There were numerous customers identified of the Dahdas, Park and Bauman.

Some of Park/Swift's customers included Jason Hansen, Justin Mercer, Jacob Forbes, Charles Kreisler, Simon Tyson, Daniel Sieber, Trent Percival and Elizabeth Watson, all of whom would purchase multi-pound quantities of marijuana to then resell. One of Forbes customers was Karl Havener, who was also purchasing quantities of marijuana to resell for a profit. Forbes also sold several pound quantities of certain strains of marijuana he was able to acquire from another source. Hansen, Watson and Percival also purchased ounce quantities of cocaine from Park and/or Swift on a regular basis. Hansen assisted Park in shipping money to California and in unpacking shipments of drugs from California. Kreisler would make deliveries of marijuana for Park/Swift and help with the shipments received from California.

Towards the end of the conspiracy, Percival developed Chad Pollard as a customer, who wanted to purchase large quantities of high grade marijuana from Park/Percival over a period of time. Pollard had been involved in a federal drug trafficking conspiracy case in 2000 and went to prison for several years. When Pollard got out he contacted Percival, who he was friends with and Pollard began working for Percival. At some point, Percival advised Pollard he was involved in trafficking high grade marijuana and in the early part of 2012 Percival began selling marijuana he was acquiring from Park to Pollard. Several successful transactions did occur of multiple pounds of different strains of marijuana and Pollard sole some of the marijuana to customers he had acquired. The three men engaged in discussions about future transactions, in which Pollard wanted to purchase hundreds of pounds of marijuana from Park/Percival.

Investigators identified California Connections, Inc., 25017 Viking Street, Hayward, California; CCI Motorsports, 4521 Metropolitan Avenue, Kansas City, Kansas; and, Region Tech, 14046 West 107th Street, Lenexa, Kansas; as businesses owned and operated by Peter Park and Wayne Swift. Investigators learned that Park, Swift, Bauman and the Dahdas utilized businesses that had been set up in Kansas and California for the express purpose of trafficking marijuana under the cover of automobile "wheels," which were shipped through ESTES Trucking in large crates. Several of the conspirators rented storage locations in Kansas and California in order to

3

store quantities of illegal drugs. The Dahdas, Park and Bauman would frequently travel to California and purchase high grade marijuana, which was shipped to Kansas, where it was distributed. U.S. currency would be driven or shipped to California in order to pay for the high grade marijuana. Bauman would specifically first ship quantities of U.S. currency to one of his California businesses in the crates, with the largest amount being approximately $800,000.00. The money was then used to purchase marijuana from various sources that were developed in California. The marijuana was also sometimes shipped by FedEx or driven back by private vehicle, where it would often be concealed in hidden compartments. The Dahdas, Park and Bauman also obtained kilogram quantities of cocaine and would often ship it in the same manner as the marijuana, back to Kansas, where it was also distributed to various customers that they had each developed. At some point, Bauman broke off from his arrangement with Park and Swift. The Dahdas continued to deal with Bauman and Park/Swift in acquiring narcotics. All of them continued to acquire the drugs from various sources in California and they would use the same method of distribution that they had perfected as a joint venture.

Bauman was also assisted by Christiansen and Aaron Gunderson in trafficking marijuana from California. Christiansen sold marijuana for Bauman at various locations in Kansas and in Chicago, Illinois. Bauman and Gunderson also acquired marijuana in Oregon on several occasions, but there were problems acquiring sufficient quantity. Gunderson delivered quantities of marijuana to individuals for Bauman and also had customers he developed that he sold marijuana to.

Bauman also developed Steven Stegall and Michael Witt as customers, who he sold marijuana and cocaine to on a regular basis. Rector, Stegall and David Hale were friends. Rector transported marijuana back from California on a regular basis. Hale would frequently drive marijuana back from California for Rector. Rector would sometimes act as a middle man in the cocaine that Bauman sold to Stegall; however, there was some cocaine that Bauman sold directly to Stegall. Ryan Kearns also purchased large quantities of marijuana from Bauman over a period of time. James Essman was an acquaintance of Bauman and the Dahdas and he was well aware they were involved in drug trafficking. Essman possessed expertise in camera systems and he was hired to install several security systems at locations where he knew the Dahdas were trafficking marijuana in Kansas and Missouri. Essman purchased ounce quantities of marijuana from Bauman and assisted the Dahdas in distributing marijuana. Sieber purchased pound quantities of marijuana from both Justin Pickel and James Essman, who were acting under the direction of the Dahdas.

Damien Mick was an employee who worked for Park and Swift, who Bauman became friends with through them. Mick later purchased MC Racing, which was a business that did custom work on vehicles. At some point Bauman loaned Mick money, which were drug proceeds, to help him with his business. Mick was well aware that Bauman was involved in drug trafficking. Michael Berry was a customer at MC Racing

and Mick introduced Berry to Bauman and Park for the purpose of purchasing marijuana from Bauman. Bauman and Park gave Mick a "kickback" for each pound of marijuana purchased by Berry. Joshua Simpson was employed by Mick at MC Racing and he purchased quantities of marijuana obtained from Bauman and Mick. Mick also introduced Bauman to an individual, who purchased large quantities of cocaine from Bauman and Mick also received a "kickback" for each kilogram of cocaine sold to this individual. Michael Berry was able to acquire a substantial amount of wealth from his drug trafficking activities, which included a strip mall and several rental properties located in Kansas City, Kansas.

Through proffer interviews, business records and drug ledgers investigators were able to identify Henry McCusker, Richard Smith, Jeffery Wall, John Paul McMillian and Erin Keller as sources of supply of high grade marijuana in California. Wayne Swift dealt with the California sources for the marijuana he and Park acquired. Two ledgers seized from Chad Bauman's bedroom on June 13, 2012, showed during one delivery that Richard Smith had supplied Bauman 275 pounds of marijuana and Jeffery Wall supplied Bauman 151 pounds. The average wholesale price for the high grade marijuana was $2,000.00 per pound with a total wholesale cost $852,000.00. Additional information had determined that Bauman obtained high grade marijuana approximately once a month during the three and half year time period. One of the ledgers also referenced the last shipment Bauman had received from California, which would have been approximately 464 pounds, which coincided with the seized marijuana from Gunderson. The ledger indicated the total shipment was 464 pounds and that Richard Smith had supplied 123 pounds and Jeffery Wall had supplied 99 pounds. Bauman had received marijuana from Smith and Wall on numerous prior occasions, as well.

John Paul McMillan and his girlfriend, Erin Keller, also supplied co-defendants high grade marijuana. Investigators learned McMillan and Keller began distributing high grade marijuana to co-defendants starting in late 2010. Keller and McMillan had a small marijuana grow in Mendocina, California; however, they were able to acquire large amounts of processed marijuana from sources in California. McMillan transported approximately 40 pounds of high grade marijuana (a street value of $160,000.00) to Lawrence, Kansas in December 2010. McMillan and Keller traveled to Kansas on at least seven different occasions, where they stayed in either Lawrence, Kansas or in the Kansas City Metropolitan area. McMillan and Keller also shipped approximately 40 pounds of high grade marijuana to Lawrence, Kansas via the U.S. Postal Service on at least five occasions. The marijuana would then be distributed to mid-level dealers. McMillan and/or Keller would travel to Kansas for the purpose of verifying delivery of the marijuana and to collect the U.S. currency before returning to California.

Henry McCusker, a/k/a "Hank," was identified as a source of supply for high grade marijuana to Chad Bauman and Stephen Rector. Investigators have learned that McCusker is a grower of high grade marijuana, which he personally supplied to co-

defendants.  Since 2009, McCusker supplied co-defendants hundreds of pounds of high grade marijuana.  It was McCusker who first introduced Bauman to Richard Smith.

Throughout the conspiracy to distribute marijuana and cocaine, Chad Bauman, Stephen Rector, and Carey Willming also conspired to commit multiple money laundering violations with the proceeds of the narcotics violations, a specified unlawful activity, by starting businesses, which included a laundromat and a tanning salon, concealing drug proceeds in bank accounts,[2] concealing drug proceeds with friends,[3] and by acquiring assets including vehicles, jewelry, personal possessions and several residences in Topeka and Lawrence. These various transactions were done either to conceal or disguise the true nature, source, location, ownership or control of the drug proceeds or the violations were monetary transaction offenses transactions conducted with proceeds in amounts greater than $10,000.00.  Agents were able to document these transactions by analyzing bank records, real estate contracts, and cash receipts and through interviews.

### Specific Events and Charged Offense Conduct

During this investigation, investigators acquired numerous GPS search warrants for cellular phones utilized by this organization. Specifically, investigators obtained several orders for Los Rovell Dahda, Roosevelt Rico Dahda, Chad Bauman, Peter Park, Trent Percival, Phillip Alarcon, Sadie Brown, Wayne Swift and Justin Pickel. In conjunction with these GPS "pings" or location data for cellular telephones and surveillance of the listed persons, investigators identified residences of the conspirators and a business associated with Los Rovell Dahda and Roosevelt Rico Dahda.  Investigators identified 119 Pawnee Avenue, Lawrence, Kansas, as being a residence for Los Rovell Dahda and Roosevelt Rico Dahda. Investigators identified 3324 East 12th Street, Kansas City, Missouri, which was commonly referred to as "The Castle," as being a residence purchased by Los Rovell Dahda.  Through Title III interceptions, "The Castle" was identified as being "fortified" with such features as a 250 pound solid cement door, metal door frames, exterior doors with multiple locks and an interior/exterior high-tech security camera system.  Roosevelt Rico Dahda listed his residence as 3034 Trail Road, Lawrence, Kansas and that he operated Established Auto Detail located at 841 Pennsylvania Street, Lawrence, Kansas, which is an address also utilized by Parker Landscape Management, a business Roosevelt Rico Dahda frequented and claimed partial ownership of as well.  GPS location data, surveillance and Title III interceptions have shown that Roosevelt Rico Dahda, Los Rovell Dahda and Sadie Brown conducted drug trafficking activity at Parker Landscape Management.  During the investigation agents utilized Confidential Informants (CIs) to conduct controlled purchases of high grade marijuana from Karl Bowman Havener, Samuel Villeareal, III, Los Rovell Dahda

---

[2] This included several bank accounts with Sunflower Bank and Fidelity Brokerage Services.

[3] Bauman gave $40,000.00 in U.S. currency, which was drug proceeds to an acquaintance, Bryan Janosik.  Law enforcement were able to eventually recover this money.

and Peter Park.  Law enforcement utilized these purchases to identify stash locations, sources of supply, as well as, co-conspirators.


In February 2007, the Olathe, Kansas Police Department executed a Johnson County District Court search warrant at a residence in their city.  Investigators located several pounds of high grade marijuana packaged for distribution, a firearm, U. S. currency and drug paraphernalia used to weigh and package the marijuana for distribution.  Investigators later learned through follow up investigation and interviews of cooperating defendants that Jean Francois Quintin distributed the high grade marijuana to Jason Phillips and Nathan Guhl.  Phillips and Guhl were prosecuted and convicted of felony drug trafficking in a Johnson County state court case.

On January 23, 2010, Chad Bauman conducted a monetary transaction at The Diamond House, a jewelry store in Kansas, when he exchanged $13,420.00 in drug proceeds for a diamond engagement ring.  On February 10, 2010, Chad Bauman conducted a monetary transaction offense when he deposited $38,000 in drug proceeds into and account he maintained at Sunflower Bank.  On March 15, 2010, Chad Bauman conducted a monetary transaction offense when he exchanged $15,740.00 in drug proceeds for the purchase of an automobile from Automotion, a licensed car dealer in Kansas.  On September 23, 2010, Chad Bauman conducted a financial transaction by paying the seller of a house in Topeka $50,000.00 in drug proceeds for a house costing $115,000.00 while concealing the payment of the drug proceeds when he represented the sales price to be $65,000.00 on the HUD-1 settlement statement.

In January 2011, DEU officers were conducting an investigation of high grade marijuana in Douglas County, Kansas, which led to the controlled purchase of one pound of marijuana from Karl Bowman Havener on January 28, 2011 and a later consent search of Havener's residence.  Havener used cellular telephone (785) 393-7844 to arrange the narcotics transaction, which occurred in the parking lot of Westlake Ace Hardware, 711 West 23rd Street, Lawrence, Kansas, which is within 1,000 feet of Lawrence High School.  Investigators received 412.22 grams of high grade marijuana during the controlled purchase and 239.29 grams of high grade marijuana from the consent search of Havener's residence.   Law enforcement also located drug paraphernalia used to weigh and package marijuana for distribution.

Through further investigation law enforcement learned the high grade marijuana was distributed to Havener by Ryan Kearns, who distributed approximately 150 pounds of high grade marijuana to Havener over a one year period.  Investigators also learned through the investigation that Chad Bauman was Kearns' source of supply for high grade marijuana.   Chad Bauman utilized a false compartment in a vehicle and a commercial trucking company to conceal and transport the high grade marijuana to Kansas.   The investigation has revealed that Chad Bauman shipped high grade

marijuana and cocaine concealed in wooden crates from California to Kansas on at least fifteen times from December 13, 2010 through June 25, 2012 utilizing Estes trucking company. It was also learned that Peter Park, Wayne Swift, Los Dahda, Aaron Gunderson, Steven Rector and other individuals assisted Chad Bauman in the shipping of controlled substances from California to Kansas.

On March 3, 2011, Kansas Bureau of Investigation personnel made a controlled purchase of high grade marijuana from Joshua Simpson in Johnson County, Kansas. Special agents executed a Johnson County, Kansas state court search warrant of Simpson's residence and located 2.7 pounds of marijuana. Investigators learned Bauman had distributed the high grade marijuana to Simpson at Bauman's business Premier Industries, 2609 Merriam Lane, Kansas City, Kansas.

On April 7, 2011, Carey Willming deposited $8,700.00 in drug proceeds into the business account of Fusion, Inc., d/b/a Ultimate Tan. This account was located at People's Bank in Lawrence, Kansas. On April 20, 2011, Carey Willming deposited $4,400.00 in drug proceeds into the business account of Fusion, Inc., d/b/a Ultimate Tan. This account was located at People's Bank in Lawrence, Kansas. On April 28, 2011, Carey Willming conducted a financial transaction when she purchased Fusion Inc., d/b/a Ultimate Tan, by paying drug proceeds in the amount of $23,500.00 in U.S. currency.

On May 16, 2011, DEU investigators executed a Douglas County District Court search warrant on Samuel Villareal's residence located at 816 Crestline Drive, Lawrence, Kansas. Investigators located and seized $11,340.00 in U.S. currency, four cellular telephones and 44 grams of marijuana from the residence. Villeareal's residence was located within 1,000 feet of the real property of West Middle School. Investigators later learned from a Cooperating Individual (hereinafter referred to as CI-1), that Villareal had removed 10 pounds of high grade marijuana from the residence prior to the execution of the search warrant. It was also learned that Los Dahda had distributed high grade marijuana to Villeareal for several month prior to the May 16, 2011 search warrant, which included the 10 pounds seized during the search warrant. A search of Villeareal's phones revealed text messages with numerous customers in Lawrence, who Villeareal was supplying with high grade marijuana.

On June 6, 2011, Chad Bauman conducted a financial transaction by paying $40,000.00 in U.S. currency that was drug proceeds to Jetz Service Co., for the purchase of equipment for Dosh Inductries, LLC. Dosh Industries, LLC is a laundromat that was a business venture between Stephen Rector, Chad Bauman, and an investor not involved in illegal activity. On June 8, 2011, Stephen Rector conducted a financial transaction by paying US Bank check 3626 in the amount of $17,000 to Jetz Service Co., for an equipment down payment for Dosh Industries, LLC. US Bank records show that significant cash deposits were made prior to the writing of check 3626. On July 5, 2011, Chad Bauman conducted a financial transaction by depositing $7,600.00 in U.C. currency into the account of Extreme Carpet Cleaning and Restoration, located at

Sunflower Bank in Lawrence, Kansas, which was commingled with three other checks.

On July 29, 2011, Michael Berry possessed a 5.7x 28 caliber FN pistol, serial number 386208138. Berry was prohibited from possessing the firearm because he was convicted in the District of Wyandotte County, Kansas, case number 2005CR695, for possession of cocaine. An interstate nexus determined the firearm was not manufactured in the State of Kansas and had been shipped and transported through interstate and/or foreign commerce.

Starting in October 2011, DEU investigators were assisted by a Cooperating Individual (hereinafter referred to as CI-2), who made four controlled purchases of high grade marijuana from Los Dahda, which occurred on November 11, 2011, November 16, 2011, November 30, 2011 and January 6, 2012. Los Dahda utilized his cellular telephones to arrange the distribution of high grade marijuana to CI-2. Los Dahda and Justin Pickel maintained a residence located at 119 Pawnee Avenue, Lawrence, Kansas, which is within 1,000 feet of the real property of Haskell Indian Nations University, to distribute high grade marijuana from and based upon surveillance and interceptions the address was specifically utilized during the November 16, 2011 controlled purchase. In addition, Los Dahda and his brother, Roosevelt Dahda, maintained and utilized their business (Gran-Daddy's BBQ, 1147 West 23rd Street, Lawrence, Kansas) to facilitate their distribution of high grade marijuana.

On November 15, 2011, James Soderling received two packages sent from California to him in Lawrence, Kansas, via United States Parcel Service (USPS), which were intercepted by law enforcement. One package contained 12.65 pounds of high grade marijuana and the other package contained 7.26 grams of methamphetamine. The narcotics were delivered to James Soderling who rented a residence located at 505 East 13th Street, Lawrence, Kansas. Investigators later learned John Paul McMillan was the source of supply of the high grade marijuana, which James Soderling intended to distribute in Kansas. Investigators learned James Soderling also intended to distribute the methamphetamine. USPS records indicate the high grade marijuana was shipped from California to Kansas from Fort Bragg, California, where John McMillan lives with his girlfriend, Erin Keller. McMillan and Keller were identified as sources of supply of high grade marijuana to James Soderling and his wife, Sarah Soderling. On at least seven occasions, John McMillan and/or Erin Keller traveled to Kansas in 2011, for the purpose of coordinating drug transactions and/or to collect drug debts.

Between January 1, 2012 and February 29, 2012, the exact date being unknown, Chad Bauman transferred $40,000.00 in U.S. currency, which was drug proceeds, to B.J., a friend a Bauman's, a transaction that was designed in whole or in part to conceal or disguise the true source, nature, location, ownership, or control of the drug proceeds.

On January 4, 2012, a federal order was signed to intercept wire communications for two cellular telephones used by Los Dahda: Target Telephone #1- (816) 769-5186

and Target Telephone #2 - (510) 229-6550.   Los Dahda stopped using Target Telephone #2 a few days prior to the authorization for interception; however, the wire interceptions from Target Telephone #1 revealed Los Dahda's marijuana distribution network operating in Lawrence, Kansas, Overland Park, Kansas, Kansas City, Missouri and Hayward, California.  Interceptions continued on this telephone until April 21, 2012 and there were 250 pertinent telephone calls.

During the interception of Target Telephone #1, Los Dahda talked to a number of individuals including Phillip Alarcon, Jeffery Paiva, Roosevelt Dahda, Sadie Brown, Justin Pickel, David Essman, Nathan Wallace (his brother), Peter Park, Wayne Swift and other identified and unidentified individuals, about drug trafficking activities.  Los Dahda gave instructions to Roosevelt Dahda, Sadie Brown, Justin Pickel, David Essman, Nathan Wallace and Amos Hurst, while using Target Telephone #1, as part of his continuing criminal enterprise for the delivery of U.S. currency to his suppliers, to arrange travel plans to California in order to purchase high grade marijuana and to be updated on the construction of an indoor marijuana grow operation in California by Justin Pickel.  Examples of a few of the intercepted calls are as follows: 1) On January 9, 2012, during a call between Los Dahda and Pickel, Los Dahda questioned Pickel about the completion of several assigned tasks.  Pickel advised he had not completed the "plumbing",[4] but would continue to work on it.  Los Dahda advised he planned to send two individuals to California to stay at Pickel's residence and to assist in completing the setup of the grow operation.  2) On, January 17, 2012, Los Dahda spoke with his brother Roosevelt Dahda and Roosevelt Dahda acknowledged a meeting between himself and Amos Hurst, a.k.a Clown.  Roosevelt Dahda informed Los Dahda that "Clown" was, "all interested." This call was an indication, which was later verified through additional calls, physical surveillance and proffer interviews that Hurst and Roosevelt Dahda travelled to California in Los Dahda's pickup truck with U.S. currency to purchase high grade marijuana. 3) On January 19, 2012, Los Dahda talked to David Essman and confirmed in guarded/coded language that Essman planned to deliver U.S. currency.  4)  On January 28, 2012, Los Dahda spoke to Hurst and Hurst confirmed he understood the "plan" and would be ready to leave with Roosevelt Dahda in a few days.

On January 19, 2012, an additional order was signed to intercept wire communications for an additional cellular telephone used by Los Dahda:  Target Telephone #4 - (501) 286-6043.  Los Dahda and the co-conspirators communicated in less guarded/coded language while communicating on Target Telephone #4.  Interceptions on Target Telephone #4 ended on February 2, 2012 and there were 99 pertinent telephone calls intercepted.  Examples of a few of these calls are as follows: 1) On January 29, 2012, Los Dahda spoke to Roosevelt Dahda who utilized Hurst's cellular telephone.   Los Dahda asked Roosevelt Dahda if Roosevelt Dahda wanted Los Dahda to distribute "five" to the unidentified customer.  Roosevelt Dahda corrected Los

---

[4] On June 13, 2012, search warrants were executed at Justin Pickel's residence in California and investigators located and seized an indoor marijuana grow operation, which had over 100 marijuana plants.

Dahda and directed him to "just give him three." Later in the conversation Los Dahda and Roosevelt Dahda confirmed Los Dahda would provide the customer with "Sd" and "CD" strains of high grade marijuana. They also discussed a payment that Los Dahda received from the customer. 2) On February 2, 2012, during a conversation between Los Dahda and Roosevelt Dahda, who utilized Philip Alarcon's cellular telephone. Los Dahda directed Roosevelt Dahda to remove U.S. Currency from the false compartment in the toolbox/fuel tank of his truck while in California and said Roosevelt "might as well take mine out too."

Investigators know from surveillance, intercepted telephone calls and information provided from cooperating individuals that on January 29, 2012, Sadie Brown, Nathan Wallace, and Roosevelt Dahda assisted Los Dahda load items in Los Dahda's truck. On one point Los Dahda and Roosevelt Dahda traveled to the Parker Landscape Management building and concealed U.S. currency in the false compartment located in the toolbox/fuel tank in Los Dahda's truck. Roosevelt Dahda and Amos Hurst then traveled to California in Los Dahda's truck containing the concealed U.S. currency. Los Dahda was able to purchase high grade marijuana with the assistance of Justin Pickel, Phillip Alarcon, Jeffery Paiva and Wayne Swift, all of whom lived in California. The high grade marijuana was then shipped to CCI Motor Sport in Kansas City, Kansas, via a commercial trucking company. The high grade marijuana was later distributed by Peter Park, Los Dahda, Roosevelt Dahda, Sadie Brown and others.

On February 2, 2012, Roosevelt Dahda drove Los Dahda's black Dodge truck to 2725 Lawrence Avenue, Lawrence, Kansas, which is within 1,000 feet of the Holcomb Sports Complex, a public playground. Investigators observed Roosevelt Dahda hand Mark Romero a blue colored pillow case, which appeared to have rectangular object inside, which was known to contain a controlled substance.

On March 12, 2012, orders to intercept wire communications from a cellular telephone used by Roosevelt Dahda - Target Telephone #6 (816) 256-6180, were signed. Roosevelt Dahda briefly used the cellular telephone then the cellular telephone was utilized by Sadie Brown until interceptions ended on April 11, 2012 and there were 59 pertinent calls intercepted during the time period. Law enforcement was able to learn that Sadie Brown assisted Los Dahda at the direction of Roosevelt Dahda by coordinating drug distribution with Justin Pickel, David Essman and Nathan Wallace, by assisting in the delivery of controlled substances and the collection of drug proceeds from Mark Romero and others. Examples of a few of the calls intercepted are as follows: 1) On March 18, 2012, Sadie Brown spoke briefly with Mark Romero and the two arranged to meet in the evening hours. 2) Later that same day, after confirming the meeting with Mark Romero, Sadie Brown spoke to Roosevelt Dahda regarding the distribution of two pounds of high grade marijuana to Mark Romero. Roosevelt Dahda stated, "Make sure that purp's one of them." The investigation revealed that co-conspirators distributed several different strains of high grade marijuana, such as, Kush, OG Kush, BK, SD, Purplemente, Purple Haze and others, and the term "purp" is a slang term for a particular strain.

11

Shortly after the conversation between Sadie Brown and Roosevelt Dahda, law enforcement conducted physical surveillance of Sadie Brown who left 119 Pawnee Avenue, Lawrence, Kansas and drove to 2725 Lawrence Avenue, Lawrence, Kansas, which is within 1,000 feet of the Holcomb Sports Complex, a public playground. Sadie Brown parked her vehicle in the driveway and exited with a black shoulder bag going to Mark Romero's residence to deliver the marijuana.

On March 26, 2012, Stephen Rector was stopped by the Utah Highway Patrol after committing a traffic infraction. Rector consented to the search of his white Ford pickup truck and troopers located and seized 40 pounds of high grade marijuana from a hidden compartment inside the toolbox/fuel tank.[5] Law enforcement learned through follow up interviews that the high grade marijuana was intended to be transported back to the Lawrence/Kansas City area to be distributed.

On March 28, 2012, investigators conducted physical surveillance of Chad Bauman. Agents observed Bauman drive to a storage facility at 491 Wakarusa Court, Lawrence, Kansas, where he accessed storage unit #312. Agents continued to conduct surveillance of Bauman until he was observed meeting with Michael Witt in the parking lot of Olathe North High School. Bauman placed three large trash bags in Witt's. Witt later left the school property and was stopped by law enforcement. After Witt provided consent to search his vehicle, agents located 27 pounds of high grade marijuana concealed in the three trash bags.

On March 28, 2012, Jacob Forbes went to 2136 Rhode Island Street, Lawrence, Kansas and collected a quantity of high grade marijuana and U.S currency from the residence. The high grade marijuana was supplied to an unindicted co-conspirator by Forbes, who was determined to be a multi-pound marijuana dealer. On April 20, 2012, Forbes utilized his cellular telephone and arranged with Peter Park to obtain high grade marijuana. Investigators conducted physical surveillance and observed Forbes to meet Park at a business in Kansas City, Missouri, where Park worked. When Forbes left the business he was observed carrying a black plastic bag, before driving off in his vehicle. Forbes was stopped by KCMO police officers and arrested for a Douglas County, Kansas warrant. The vehicle was searched and officers located one pound of high grade marijuana marked "HBK out" and $11,200.00 in U.S. currency.

On April 5, 2012, orders were signed to intercept wire communications from a cellular telephone used by Roosevelt Dahda - Target Telephone #8 (816) 277-1398 and two cellular telephones used by Peter Park - Target Telephone #9 (913) 238-7525 and Target Telephone #10 (816) 291-7793. During the interception time period agents intercepted 126 pertinent telephone calls from Target Telephone #8, 584 pertinent

---

[5] Through follow up investigation and interviews investigators located and seized the same style toolbox/fuel tank from Justin Pickel and Los Dahda. It was also learned the other co-defendants designed and manufactured the false toolbox/fuel tank.

telephone calls from Target Telephone #9 and 204 pertinent telephone calls from Target Telephone #10.   Through interception of Target Telephone #8 law enforcement confirmed that Roosevelt Dahda directed Justin Pickel, Sadie Brown and others in the conspiracy to distribute high grade marijuana.   Through interception of Target Telephones #9 and #10 investigators were able to identify Wayne Swift, Thomas Kreisler, James Soderling, Simon Tyson, Trent Percival and other co-conspirators who purchased and distributed large quantities of high grade marijuana. Examples of a few of these calls are as follows: 1) On April 9, 2012, Peter Park utilized Target Telephone #9 and spoke to Wayne Swift and asked Swift how much money did you give to "him." Swift later responded "55." 2) On April 15, 2012, Peter Park utilized Target Telephone #9 to speak with Simon Tyson and Park explained to Tyson that he was out of a previously supplied strain of high grade marijuana.   Park told Tyson he had some "HBK." Tyson stated, "I'm fine with that." 3) On April 20, 2012, Park spoke to Thomas Kreisler several times while utilizing Target Telephone #9.   Park directed Kreisler to pick up the crate, remove the high marijuana and to transport it to Park's location in Kansas City, Missouri.   During one call Park told Kreisler, "It'll be ready at 3:00."   Kreisler replied, "Perfect, I'll be there."   In a subsequent call Park asked if Kreisler had his "sealer" and Kreisler acknowledged that he did.   Park told Kreisler to take out a sample of the "HBK."   Park asked Kreisler to bring the "oil filters" in a big suitcase and bring the items to him at the clothing store. 4)   On April 24, 2012, Roosevelt Dahda utilized Target Telephone #8 and spoke to Justin Pickel as he transported high grade marijuana from California to Kansas.   Pickel told Roosevelt Dahda, "I could shoot south at that point and it would not be crazy out of the way or I could just keep going," as they debated if Pickel should make a delivery to one of Roosevelt Dahda's multi-pound customers in Kansas.

On April 20, 2012, in connection with the above referenced calls between Park and Kreisler, investigators know that Kreisler drove to Estes trucking company in Kansas City, Kansas and received a wooden crate containing high grade marijuana.   Kreisler drove the crate with the concealed marijuana to CCI Motorsport, 4521 Metropolitan Avenue, Kansas City, Kansas, which is a business owned and operated by Park.   Kreisler removed the high grade marijuana from the crate and transported the high grade marijuana and drug paraphernalia used to package and distribute marijuana to Park in Kansas City, Missouri, where some of the high grade marijuana was distributed to Simon Tyson and Jacob Forbes. On April 17, 2012, prior to the high grade marijuana arriving in Kansas City, Kansas investigators learned through video surveillance at a warehouse location in Hayward, California that Wayne Swift had shipped the high grade marijuana concealed in the crate from California to Kansas.   Interviews of cooperating individuals have revealed the high grade marijuana was concealed in boxes, which were shipped in wooden crates along with boxes containing vehicle wheels/rims.   It has been determined that the high grade marijuana was purchased by James Soderling for Park.   An email obtained by investigators dated April 17, 2012, from James Soderling to Park indicated the shipment contained "33" pounds of high grade marijuana and that strains of the high grade marijuana included "HB", "SE", "Sour D", "U2", which were all grown indoors and "HBK", "silv haze" and "SDX", which were all grown outdoors.

On April 24, 2012, Elizabeth Watson went to CCI Motorsports in Kansas City, Kansas after ordering "fourteen" based upon an intercepted call on Target Telephone #9, from Peter Park earlier in the day. Elizabeth Watson arrived at the business and left after a few minutes. On April 26, 2012, Watson again spoke to Park and placed an order for "fourteen on the green and then twenty on the detergent." It is known that Watson purchased "green," which was code for high grade marijuana and "detergent," which was code for other controlled substances. Watson was confirmed to be a distributor of high grade marijuana, "bath salts" and cocaine.

On April 25, 2012, Justin Pickel was stopped on Interstate I-80 in Nebraska by Nebraska Highway patrol officers. After a certified narcotics detection canine alerted on the vehicle a search of Pickel's truck was conducted and troopers located and seized approximately 38 pounds of high grade marijuana concealed in a false compartment in a toolbox/fuel tank. On April 26, 2012, investigators monitored an intercepted call on Target Telphone #9 between Roosevelt Dahda and Los Dahda, where they discussed moving their personal possessions from their residence at 119 Pawnee Avenue, Lawrence, Kansas. During the call, Los Dahda informed Roosevelt Dahda, "We just lost half of what we worked for, so you know we'll run like conservative status." Later in the conversation Los Dahda informed Roosevelt Dahda he may distribute marijuana "here" and at the price "I paid for it here." Through prior physical surveillance, monitored phone calls and electronic surveillance investigators were able to determine Los Dahda was in California at the time of the call. Investigators have learned from subsequent interviews that Los Dahda obtained high grade marijuana from Jeffery Paiva, Phillip Alarcon and others growers and brokers in California, which were shipped or transported to Kansas.

On April 29, 2012, during an intercepted phone conversation between Park and James Soderling investigators obtained information which indicated Daniel Sieber would travel from Lawrence, Kansas to CCI Motorsports, in Kansas City, Kansas to obtain high grade marijuana. At approximately 2:10 p.m., investigators observed Sieber arrive at the business in his pickup truck, exit the vehicle with a black bag and enter the business. Sieber left the business approximately 12 minutes later carrying the black bag, which then contained a quantity of marijuana. Sieber then traveled to his residence at 230 Perry Street, Lawrence, Kansas.

On April 30, 2012, investigators intercepted a telephone call between Park, who was utilizing Target Telephone #9 and Jason Hansen and they discussed weights of marijuana, which were to be distributed later. After a lengthy discussion about the weights of controlled substances it appeared Jason Hansen had not weighed the high grade marijuana accurately. Park told Hansen he would provide Hansen packages of "28, 28 and 112," which would correspond to one ounce and quarter pound/four ounce quantities of marijuana.

14

On April 30, 2012, James Soderling and his wife, Sarah Soderling, transported high grade marijuana from Fort Bragg, California, where they live, to California Connections in Hayward, California, which was a business operated by Park and Wayne Swift. The Soderlings met Swift and provided him with 49 pounds of high grade marijuana. An email, which was later discovered, indicated the wholesale price of the high grade marijuana was $101,700.00. Swift was able to conceal the high grade marijuana in a shipping crate and he shipped the marijuana to Kansas. On May 5, 2012, Park and Kreisler went to Estes trucking company in Kansas City, Kansas and picked up the crate containing the high grade marijuana.

On May 4, 2012, Chad Bauman conducted a monetary transaction when he paid $59,864.00 by check to Twin Motors Ford in Iola, Kansas for the purchase of a Ford F-450 truck. The check was drawn from an account owned by Chad Bauman styled in the name CB Auto Sales, which was an account that contained drug proceeds.

On May 7, 2012, Peter Park utilized Target Telephone #10 and spoke to Trent Percival. Park told Percival he had "thirty cases," but could provide Percival with "twenty." The two discussed that Percival had a customer who wanted 20 pounds of high grade marijuana. Investigators later conducted physical surveillance of Percival and watched him go to Park's business located at 14046 West 107th Street, Lenexa, Kansas, and he was placing a box in his vehicle that he carried from the business. Percival then drove to Chad Pollard's residence, 10025 Falcon Valley Drive, Lenexa, Kansas where he met Pollard. After a short period of time, Percival and Pollard left the residence and drove a short distance, where they again met. Percival placed the box into Pollard's vehicle. Pollard then drove to iRise Performance, 21957 West 83rd Street, Shawnee, Kansas and pulled his vehicle into a garage bay, where the door was closed. Pollard later returned to Percival's location. Investigators have been able to confirm that Percival distributed ten pounds of high grade marijuana to Pollard.

On May 11, 2012, Park again utilized Target Telephone #10 and spoke to Percival about Percival's customer wanting a sampling of high grade marijuana. Park agreed to meet at Percival's residence at 7607 West 154th Terrace, Overland Park, Kansas to deliver a sample of the high grade marijuana. Investigators conducted physical surveillance and observed Park arrive and enter the residence. On May 12, 2012, investigators observed Percival meet Pollard at Pollard's residence. It has been confirmed through subsequent interviews that high grade marijuana from Park was distributed to Pollard on May 7, 2012 and on May 12, 2012.

On May 11, 2012, investigators intercepted two telephone calls between Justin Mercer and Peter Park who used Target Telephone #9. During the calls, Mercer ordered two pounds of high grade marijuana and later arranged to meet Park at his business in Lenexa, Kansas. Investigators later observed Mercer enter the business and exit a short time later carrying a dark colored back pack. Investigators have learned that Mercer obtained quantities of high grade marijuana from Park on numerous occasions and that he in turn distributed the marijuana to others.

On May 14, 2012, Park utilized Target Telephone #9 and again spoke to Mercer and the two agreed to meet at Park's business in Lenexa, Kansas.  Mercer was observed going to and from the location.  A short time later, Mercer again called Park and ordered an additional pound of "headband" strain high grade marijuana.  Investigators then observed Mercer drive to Lawrence, Kansas, and meet an individual in a parking lot.  The individual got into Mercer's vehicle and when he exited, he had a package, which appeared to conceal a pound of high grade marijuana.  Investigators monitored other calls between Park and Mercer, who told Park he had collected U.S. currency and would meet him later in the evening in the Kansas City area.  At approximately 7:14 p.m., Mercer was stopped on Kansas Highway 10 by a Douglas County Sheriff's deputy after committing a traffic infraction.  The odor of raw marijuana was detected coming from Mercer's vehicle.  During a search of the vehicle, the deputy located a bag containing high grade marijuana, $18,180.00 and 147 anabolic steroid pills.

On May 14, 2012, as was done on numerous other occasions, investigators know that Swift shipped high grade marijuana concealed in a crate via Estes Trucking from Hayward California to Kansas City, Kansas.  On May 15, 2012, Park utilized Target Telephone #10 and spoke to Los Dahda and they discussed providing a customer with six pounds of Los Dahda's high grade marijuana.  Los Dahda indicated if the deal did not occur as planned they could finish the deal later.   Approximately twenty minutes later Park called Percival and the two discussed distributing Park's "guys" six pounds of high grade marijuana.  Percival said he was attempting to make contact with his customer to distribute the high grade marijuana.

Investigators seized an email sent to Peter Park on May 16, 2012, from James Soderling, who referenced 60 pounds of high grade marijuana that James Soderling obtained for Park and Swift, which was shipped by Swift on May 15, 2012.  The email mentioned how many pounds of several different strains of high grade marijuana, i.e., "og kush", "bk", "spk", "headbd", "og"  and "purp kush" had been shipped, with a total wholesale cost listed at $137,800.00.

On May 17, 2012, Park and Kreisler drove to the Estes Trucking terminal in Kansas City, Kansas, where they picked up the crate shipped by Swift on May 14, 2012 and drove it to CCI Motorsport in Kansas City, Kansas.  Investigators have been able to verify through interviews and wire interceptions that high grade marijuana was obtained from growers/brokers in California and shipped via Estes Trucking Company to Kansas, where it was unpacked at CCI Motorsports for distribution.

On May 22, 2012, Park met with a Cooperating Individual (CI-3), who had previously agreed to cooperate with law enforcement in the hopes of receiving consideration regarding possible narcotic distribution charges, at CCI Motorsports in Kansas City, Kansas.  CI-3 met Peter Park at the business and obtained one pound of high grade marijuana.  It has been determined that James Soderling had directed Park to deliver the high grade marijuana to CI-3.  The May 16, 2012, email sent by James Soderling to

Park referenced, "+3 birthday wraps for law folk," which referenced the high grade marijuana distributed to CI-3 which was wrapped in gift paper.

On May 22, 2012, Park utilized Target Telephone #9 to speak with Swift.  Park told Swift that he planned to send him $84,700.00 by referencing "we got" $80,000.00 and "the big one" had $4,700.00.  Park and Swift discussed purchasing a "counter" for the U.S. currency.  On May 22, 2012, Park sent a package to Swift, via FedEx.  On May 23, 2012, the package was detained pending the application of a search warrant, which was obtained on May 24, 2012.  The package was opened and $84,700.00, in U.S. currency was seized.  There was a yellow piece of paper with the money, which had the handwritten message "80k (us) L- 4,700."  It has been verified through the investigation that Park had provided $80,000.00 and Los Dahda had provided $4,700.00.  The $84,700.00 was to be used to purchase high grade marijuana to be distributed in Kansas.

On May 22, 2012, Daniel Sieber called Peter Park on Target Telephone #10.  Sieber asked Park if he could obtain one of "those gears" and "one of those headbands."  Park agreed to meet Sieber "tomorrow."    On May 23, 2012, Sieber and Park spoke again and Sieber stated he preferred "a headband."  Park and Sieber agreed to meet in approximately forty-five minutes.  Sieber was observed arriving at CCI Motorsports forty-five minutes later and he entered the business with a black gym style bag.  He exited the business with the bag approximately six minutes later.

On May 29, 2012, Sieber called Park on Target Telephone #10 and asked Park if he had any "wheels."  Park told Sieber he would not receive any wheels for "another week."  Park later told Sieber, "I have mine."  Sieber then asked, "How many are there?" and if Park had "any outs laying around?"  Park advised he did and Sieber ordered "four."  They agreed to meet the following morning at McDonald's in Lawrence, Kansas.  Investigators have learned that high grade marijuana grown outside is commonly referred to as "out" or "outs" and high grade marijuana grown indoors is commonly referred to as "in" or "ins."

On, May 30, 2012, investigators observed Park meet Sieber in a McDonald's parking lot in Lawrence, Kansas.  Park exited his vehicle with a dark colored gym bag and entered Sieber's vehicle.  After a few minutes Park exited the vehicle without the bag and returned to his vehicle.  Sieber  returned to his residence at 230 Perry Street, Lawrence, Kansas and when he exited he was carrying a dark colored gym bag.

On, May 30, 2012, Hansen called Park on Target Telephone #9.  Hansen explained to Park he was waiting on a customer before making contact with Park later that evening.  Hansen agreed to "come through" and meet Park at his business in Kansas City, Missouri.  It has been determined that Hansen acquired marijuana from Park when the two met on that date.

On June 6, 2012, investigators conducted physical surveillance of Peter Park who drove from Olathe, Kansas to a Sonic Drive-In in Lawrence, Kansas. Park exited his vehicle and entered Daniel Sieber's truck. After a few minutes, Park exited the vehicle and left the area. Investigators followed Sieber back to his residence and observed him exit carrying a dark colored gym bag. It has been determined that Park distributed marijuana to Sieber during the meeting. On June 13, 2012, a consent search was conducted at Sieber's residence at 230 Perry Street, Lawrence, Kansas. Investigators located and seized paraphernalia used to package high grade marijuana for distribution, over three pounds of high grade marijuana and $23,648.00 in U.S. currency.

On June 11, 2012, Chad Bauman and Aaron Gunderson rented a storage unit located at 321 J Forbes Field, Topeka, Kansas. It has been determined that the two used this location to receive shipments of high grade marijuana and to store high grade marijuana.

On June 12, 2012, investigators conducted physical surveillance of James and Sarah Soderling, who were seen placing two boxes and two suitcases in their vehicle in Fort Bragg, California. The two then traveled from California to Lawrence, Kansas. On June 15, 2012, investigators located and seized approximately 56 pounds of high grade marijuana in a hotel room in Utah. It was learned through follow up investigation and interviews that the Soderlings had concealed the high grade marijuana in the hotel room after they became aware that law enforcement had executed a search warrant at their residence on June 13, 2012. The Soderlings obtained the high grade marijuana from John Paul McMillan with U.S. currency which had been sent by Peter Park via FedEx shipping company.

On June 13, 2013, investigators executed a federal search warrant at Percival's residence located at 7607 West 154th Terrace, Overland Park. Kansas. Investigators located and seized a .45 caliber ACP Taurus pistol, Model 24/7, serial number NYD82719; a 12 gauge Mossberg shotgun, serial number T4562435; and, a .357 caliber Rossi revolver, serial number CP773840 in Percival's master bedroom, all of which were loaded. Investigators also located and seized a .22 caliber LR GSG-5P rifle, serial number A30421; a 9mm Springfield Armory pistol, Model XP9, serial number US859024; a .308 caliber Springfield Armory rifle, Model M1A, serial number 114766; a 12 gauge Browning shotgun, Model Goldfinger, serial number 113MZ14281; a .22 caliber LR Smith & Wesson rifle, Model M&P 15-22, serial number DUU5907; a 5.56 Rock River Arms rifle, Model LAR-15, serial number KT1060-28; and, a .22 caliber Smith & Wesson revolver, Model Single-Six, serial number 264-47754; along with ammunition from the residence. Percival admitted that he had the firearms in his bedroom to protect himself and his drugs and/or drug proceeds, which he would have at his residence. Investigators located and seized paraphernalia to distribute and/or use marijuana in the residence. Percival also admitted to being a user of controlled substances while possessing the firearms and ammunition, which prohibited him from lawfully possessing any firearms or ammunition. An interstate nexus on the firearms

and ammunition determined they were manufactured outside the State of Kansas and would have traveled through interstate and/or foreign commerce to be found in Percival's possession.

On June 13, 2012, DEA agents arrested Michael Berry at his residence in Kansas City, Kansas. A consent search of the residence was conducted and agents located and seized a small amount of marijuana; a .45 caliber Glock pistol, Model 30, serial number SKA490 (located in his truck); a 5.56mm Kel Tec pistol, Model PLR-16, serial number P1X49 (located in his bedroom closet); and, a 5.7 x 28 caliber FN pistol, Model Five-Seven, serial number 386221208 (located in his bedroom closet). In 2005 Michael Berry was convicted in Wyandotte County, Kansas District Court, case # 2005CR695 for possession of cocaine, a felony. An interstate nexus on the firearms and ammunition determined they were manufactured outside the State of Kansas and would have traveled through interstate and/or foreign commerce to be found in Berry's possession.

On June 13, 2012, Nathan Wallace was contacted and stopped in his vehicle by Lawrence, Kansas police officers, while they executed a search warrant at Parker Land Management, 841 Pennsylvania Lawrence, Kansas. Officers detected an odor of marijuana coming from his vehicle and after searching the vehicle they located and two and half pounds of high grade marijuana concealed in the vehicle. Wallace possessed the high grade marijuana within 1,000 feet of New York Elementary School. The high grade marijuana was marked with the same strain name as high grade marijuana located and seized during a search warrant executed at Los Dahda and Nathan Wallace's residence located at 3324 East 12th Street Kansas City, Missouri, which was commonly referred to as "The Castle."

On June 13, 2012, investigators executed a federal search warrant at Peter Park's residence located at 11570 Longview Street, Olathe, Kansas. Investigators located and seized a .45 caliber Springfield Armory pistol, Model XD-45ACP, serial number US609848; a .40 caliber Glock pistol, Model 23, serial number PX763; 5.56 caliber Herstal Belgium rifle, Model Bulpup FS2000, serial number 026226; and, a12 gauge Remington shotgun, Model 870 express magnum, serial number A165942M in Park's master bedroom, all of which were loaded. Individuals involved in drug trafficking will often possess firearms to protect themselves from robberies to steal their drugs or drug proceeds.

On June 13, 2012, law enforcement did a number of other search warrants in connection with this investigation, including in California. When agents searched Alarcon's residence they located $120,000.00 hidden in his attic. This was U.S. currency that Bauman had given to Alarcon.

On June 28, 2012, investigators received information that Aaron Gunderson had concealed high grade marijuana. Investigators received consent to search a residence located at 36549 Cemetery Road, Paxico, Kansas, where they located and seized

19

approximately 369 pounds/151 kilograms of high grade marijuana. Investigators have learned that the high grade marijuana had been purchased by Chad Bauman in California from Richard Smith and Jeffery Wall. The marijuana had been shipped to the storage unit located at 321J Forbes Field, Topeka, Kansas, where it was stored until it was moved by Aaron Gunderson to Paxico, Kansas.

On July 30, 2012, Kansas Highway Patrol (KHP) Lieutenant Richard Jimerson stopped Brent Swain as he traveled westbound on Highway I-70 in Wabaunsee County, Kansas after Brent Swain committed a traffic infraction. Lieutenant Jimerson requested a narcotic detection K9, which alerted on Swain's vehicle. During a search of the vehicle troopers seized $47,980.00 concealed in the vehicle. Through investigation and follow-up interviews investigators learned that Steven Stegall had provided Brent Swain the U.S. currency to purchase high grade marijuana in Colorado, because his other source of marijuana (Bauman) had been arrested by law enforcement. Stegall had an unpaid drug debt to Bauman for cocaine and marijuana totaling about $80,000.00.